**PENSION BENEFIT GUARANTY CORPORATION, Plaintiff–Appellee,**

**and**

**United Rubber, Cork, Linoleum and Plastic Workers of America, Solomon Reddix and Alex Williams, Plaintiffs–Intervenors–Appellees,**

v.

**OUIMET CORPORATION, Ouimet Stay & Leather Company, Ouimet Welting Company, Emil R. Ouimet Wareham Trust, Avon Sole Company, Tenn–ERO Corporation and Herbert Kahn, Trustee, Defendants–Appellants.**

No. 79–1414.

United States Court of Appeals, First Circuit.

Argued Dec. 4, 1979.

Decided Aug. 29, 1980.

---

Richard G. Maloney and Sidney Werlin, Boston, Mass., with whom Maloney, Williams & Baer, Richard M. Zinner, Friedman & Atherton, Paul P. Daley, Hale & Dorr, Richard E. Mikels, and Riemer & Braunstein, Boston, Mass., were on brief, for defendants–appellants.

Judith F. Mazo, Washington, D.C., with whom Henry Rose, James N. Dulcan and Burns, Jackson, Miller, Summit & Washington, Washington, D.C., were on brief, for Pension Benefit Guaranty Corp., plaintiff–appellee.

Bertram Diamond, Stamford, Conn., for United Rubber, Cork, Linoleum and Plastic Workers of America, Soloman Reddix and Alex Williams, plaintiffs–intervenors–appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Jurisdiction in this interlocutory appeal from the United States District Court for the District of Massachusetts is predicated upon 28 U.S.C. § 1292(b).[1] The issue is one of first impression involving the interpretation of the Employee Retirement Income Security Act of 1974 (ERISA), Pub.L.No. 93–406, 88 Stat. 832, 29 U.S.C. §§ 1001–1381.

The case[2] began with the bankruptcy of a corporation, Avon, and its wholly owned subsidiary, Tenn–ERO, which were part of a larger group of corporations, the Ouimet Group.[3] A brief prefatory explanation of ERISA, and the role in it of the Pension Benefits Guaranty Corporation (PBGC), is necessary to appreciate the issues. Under ERISA, PBGC assumes the administration and payment of benefits of a terminated pension plan whose assets are insufficient to cover all guaranteed benefits. PBGC may recover from the employer 30% of its net worth determined as of a date within one hundred twenty days of the plan termination, or the deficit, whichever is less. The bankrupts, here, had no positive net worth as of the valuation date. This means that, if the term "employer" is limited to the bankrupts, PBGC recovers nothing and a dividend will be paid to the creditors. If, on the other hand, "employer" is construed to mean the Ouimet Group of corporations, including the bankrupts, it is probable that PBGC will receive all of the bankrupts' assets with the creditors receiving nothing.

### The Ouimet Group of Corporations

Over forty years ago, Emil R. Ouimet purchased the Brockton, Massachusetts shoe–trim manufacturing concern for which he had worked for several years. In 1940, he changed its name to Ouimet Leather

---

1. In pertinent part, 28 U.S.C. § 1292(b) provides:

    (b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order . . . .

2. The opinion of the district court is reported at 470 F.Supp. 945.

3. The Ouimet Group challenges certain retroactively–applied provisions of ERISA. After oral argument in the instant case, the Supreme Court heard oral arguments in *Nachman Corp. v. Pension Benefit Guar. Corp.*, —— U.S. ——, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), which also involved a retroactivity challenge to the Act. Accordingly, we postponed our decision until the Supreme Court had decided *Nachman*.

Company. He renamed it Ouimet Stay & Leather Company (Stay) when production expanded to include shoe upper strippings as well as other types of shoe findings.[4] In 1950, he founded Ouimet Corporation (Ouimet), a Delaware corporation with its principal place of business in Nashville, Tennessee. Ouimet manufactures shoe findings, laminations, and vinyl–coated fabrics. Emil also founded Brockton Plastics (Brockton), a Massachusetts corporation producing, among other things, shoe welting, and Ouimet Welting (Welting), a now–dormant corporation. In 1968, Ouimet purchased the Avon Sole Company (Avon), a shoe sole manufacturing factory located in Holbrook, Massachusetts. In 1972, Avon formed a wholly–owned subsidiary, Tenn–ERO, to operate a nonunion plant in Lawrenceburg, Tennessee.

In 1971, Emil Ouimet created the Wareham Trust (Trust) as a tax device. Its assets include the combined Stay–Brockton factory and the houses in which Emil and his son Richard reside.

Emil Ouimet owns 100% of Trust; 80% of Ouimet; and 80% of Stay. He owned all stock in Avon which, in turn, held 100% of Tenn–ERO's stock. Stay has a 100% interest in Ouimet Welting; and a 50% interest in Brockton. At all times pertinent to this litigation, Emil Ouimet was president of all Ouimet Group corporations except Ouimet and Stay, of which Richard was president.

### The Plan

Pursuant to a collective bargaining agreement with the Rubber Workers Union and the International Brotherhood of Firemen and Oilers, Avon instituted a pension plan for its hourly workers in 1959. The plan provided for full vesting[5] after ten years of service, if certain age criteria were

satisfied. It gave the company the right to "amend, modify, suspend or terminate the Plan" and limited the benefits payable upon termination of the plan to "the assets then remaining in the Trust Fund." Avon made all actuarily mandated contributions, but at all times the plan was underfunded. There were three reasons for this. (1) Initial underfunding occurred because credit was given for past years of service while no immediate contribution to the plan for this credit was required. Rather, the deficit was expected to be amortized over thirty years. (2) Ouimet negotiated several benefit increases which were not met by current contributions. (3) A decrease in the value of certain fund investments in 1974 and 1975 led to a devaluation of the plan assets. When Ouimet purchased Avon, the underfunding amounted to $92,000. By March 25, 1975, the day Avon closed its doors, it was $552,339.64.

### Prior Proceedings

On June 18, 1975, Avon and Tenn–ERO filed Chapter XI bankruptcy petitions; on March 22, 1976, they were adjudicated bankrupts. When the plant shut–down appeared imminent, Avon notified PBGC of its intent to terminate the pension plan.[6] PBGC responded to Avon's request to terminate the plan with a letter stating:

> It has been determined that Avon Sole Company was the employer who maintained the Plant at the date of termination for purposes of Section 4062 of the Act, 29 U.S.C. § 1362.

It estimated Avon's liability to be $717,500 and filed a proof of claim in the Avon/Tenn–ERO bankruptcy proceeding for that amount. After examining the bankrupts' books,[7] PBGC determined that Ouimet, Stay, and Welting should also be

---

**4.** A finding is a trim, decorative item, or small stripping stitched onto the upper portion of a shoe. The terms finding and stay are interchangeable.

**5.** Vesting is defined as the "nonforfeitable right of interest which an employee acquires in the pension fund." Employee Retirement Income Security Act of 1974, H.R.Rep.No. 533, *reprint-*

*ed in* [1974] U.S.Code Cong. & Ad. News 4639, 4643.

**6.** 29 U.S.C. § 1341(a) requires plan administrators to notify PBGC of proposed terminations at least ten days prior to the proposed termination date.

**7.** PBGC has broad investigatory authority under 29 U.S.C. § 1303(a) ·(c).

considered employers who maintained the plan. It computed the liability of the five corporations at $552,339.64[8] and filed an amended proof of claim in that amount in the bankruptcy proceedings. Ouimet and Stay filed proofs claiming that, if held liable, they should be subrogated to the rights of PBGC against Avon and Tenn–ERO. The bankruptcy trustee cross–claimed alleging that Ouimet and Stay should reimburse the estate for any payments which Avon and Tenn–ERO would be required to make to PBGC. On March 31, 1976, PBGC filed suit against the Ouimet Group in the United States District Court for the District of Massachusetts.[9] After filing suit against Ouimet, Stay, Welting, Avon, and Tenn–ERO, PBGC determined that Trust should be treated as an employer as well and it was joined as an additional defendant.

The district court named PBGC trustee of the Avon plant.[10] It appointed the bankruptcy judge sitting on the Avon/Tenn–ERO proceedings to serve as master.[11] Following a twelve–day trial in December, 1976, the bankruptcy judge recommended that no liability attach to the Group and that Avon/Tenn–ERO's negative net worth relieved them of liability to PBGC. After release of the bankruptcy judge's memorandum, Union moved to intervene to protect the interests of former Avon employees and the district court granted the motion. The court held a hearing on March 13, 1979. In its opinion, it ruled that ERISA imposes joint and several liability on all members of a controlled group of corporations. After a careful analysis of the statutory and constitutional issues, it granted PBGC's motions for partial summary judgment and for relief from the automatic stay in bankruptcy and remanded the case to the bankruptcy court for a determination of the net worth of the Ouimet Group of corporations. *Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 470 F.Supp. 945, 954, 958 (D.Mass. 1979). We affirm, but on somewhat different grounds.

## The Statutory Scheme

The employer–sponsored retirement income program, as one form of worker compensation, came into prominence in the 1940's. Expansion of coverage and a parallel increase in plan assets were marked in the ensuing decades. The field was unregulated by the federal government until the enactment, in 1958, of the Welfare and Pension Plans Disclosure Act. 29 U.S.C. § 301 *et seq.* Its purpose was to curb abuses by those to whom plan administration was entrusted. In 1962, criminalization of certain acts of malfeasance gave the earlier legislation some clout. Employee Retirement Income Act of 1974, H.R.Rep.No. 93–533, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News pp. 4639, 4640–41. Plans administered jointly by employers and unions were under the dominion of the

---

**8.** Maximum liability to PBGC is the lesser of the pension underfunding or 30% of the employer's net worth. 29 U.S.C. § 1362(b). PBGC determined the net worth of the Ouimet Group, excluding Trust and Brockton, to be $1,875,283 on December 31, 1974. Because 30% of net worth ($562,601.70) exceeds the amount of pension underfunding ($552,339.64) the liability equals the pension fund deficit.

**9.** 29 U.S.C. § 1303(e) authorizes PBGC to bring suit for legal and/or equitable relief. Jurisdiction is vested in the United States district courts.

After commencement of plan termination, if PBGC finds that the plan is unable to pay basic benefits, 29 U.S.C. § 1341(e) empowers PBGC to apply to the district court for a decree adjudicating that the plan must be terminated according to procedures outlined in 29 U.S.C. § 1342. Pending adjudication, "such court shall stay . . . any pending bankruptcy." 29 U.S.C. § 1342(f).

**10.** 29 U.S.C. § 1342(b) authorizes the appointment by the district court of PBGC as trustee. The court named PBGC trustee of Avon's plan on April 20, 1976, ordering that the termination be effective as of March 25, 1975. PBGC now pays monthly benefits averaging $87 to 108 employees. An additional 150 workers will receive no pension because their rights were not vested when Avon went out of business.

**11.** A district court may appoint a special master "in matters of account and of difficult computation of damages." Fed.R.Civ.P. 53. The proceedings were consolidated because the issues in both cases were "substantially identical." *PBGC v. Tenn–ERO Corp.*, No. 76–1314 (D.Mass. May 13, 1977).

Labor Management Relations Act, 29 U.S.C. § 141 *et seq.* The tax advantages accruing to employers prompted Congress to enact Revenue Code provisions controlling plan contributions. 26 U.S.C. §§ 401–404. Only a plan maintained "for the exclusive benefit of [the] employees or their beneficiaries" was deemed qualified. 26 U.S.C. § 401(a)(4). Of primary significance were antidiscrimination rules denying deductions if a plan was designed to benefit officers, shareholders, or highly compensated employees. *Id.*

By 1974, pension plans had burgeoned to include over thirty million workers; $150 billion in assets were held in trust for pensions, H.R.Rep.No. 533, *supra, reprinted in* [1974] U.S.Code Cong. & Ad.News at 4641, and twenty thousand workers were annually affected by pension plan failures. Employee Retirement Income Security Act of 1974, S.Rep.No. 383, 93 Cong.2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad. News, 4890, 5036. In many instances, benefits were subject to forfeiture "even when separated employees [were] within a few months, or even days, of qualifying for retirement." H.R.Rep.No. 533, *supra, reprinted in* [1974] U.S.Code Cong. & Ad.News at 4643. The cloud of forfeitability was attributable to lack of uniformity in vesting, the Internal Revenue provisions requiring funding of current, but not past–service liabilities, and plan agreements which generally limited employee benefits to the corpus of the pension fund if a plan terminated prematurely.

Congress confronted these problems by enacting ERISA, a comprehensive statutory scheme detailing "minimum standards . . . assuring the equitable character of [pension] plans and their financial soundness." 29 U.S.C. § 1001(a).[12] 29 U.S.C. §§ 1301–1381 created the Pension Benefit Guaranty Corporation and instituted a system of pension plan termination insurance. Designed to guarantee minimum pension benefits to workers whose employers discontinue pension plans, termination insurance is an industry–wide risk and cost–sharing program. From a pool of premiums contributed by employers who maintain plans, PBGC pays vested benefits to affected employees when a plan terminates. In addition to participation in the insurance program, which is mandatory in most instances, "any employer who maintained a plan (other than a multiemployer plan) at the time it was terminated," 29 U.S.C. § 1362(a), is liable to PBGC for the lesser of

(1) the excess of—

(A) the current value of the plan's benefits guaranteed under this subchapter on the date of termination over

(B) the current value of the plan's assets allocable to such benefits on the date of termination, or

(2) 30 percent of the net worth of the employer determined as of a day, chosen by the corporation but not more than 120 days prior to the date of termination, computed without regard to any liability under this section.

29 U.S.C. § 1362(b).

### *Who Is The Employer?*

We start with the definition section of subchapter III—Plan Termination Insurance. 29 U.S.C. § 1301(b) provides in part:

For purposes of this subchapter, under regulations prescribed by the corporation, *all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer.* The regulations prescribed under the preceding sentence shall be consistent and co–extensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26[13] (emphasis added).

---

**12.** 29 U.S.C. §§ 1001–1144 set out requirements of minimum participation, vesting, and funding. 26 U.S.C. §§ 401–415 contain coordinate tax provisions. 29 U.S.C. §§ 1201–1242 detail the procedure for the agencies to whom enforcement is relegated.

**13.** 26 U.S.C. § 414(c) states in pertinent part, "all employees of trades or businesses (whether

Section 1301(b) applies, by its terms, only to groups "under common control" as that

term is defined in regulations coextensive with the regulations under 26 U.S.C.

or not incorporated) which are under common control shall be treated as employed by a single employer."

**14.** Temporary Treasury Regulations promulgated under 26 U.S.C. § 414(c) provides in part:

§ 11.414(c) 2 Two or more trades or businesses under common control [TD 7388, filed 10 31 75].

(a) In general. For purposes of this section, the term "two or more trades or businesses under common control" means any group of trades or businesses which is either a "parent subsidiary group of trades or businesses under common control" as defined in paragraph (b) of this section, a "brother–sister group of trades or businesses under common control" as defined in paragraph (c) of this section, or a "combined group of trades or businesses under common control" as defined in paragraph (d) of this section. For purposes of this section and §§ 11.414(c) 3 and 11.414(c) 4, the term "organization" means a sole proprietorship, a partnership (as defined in section 7701(a)(2)), a trust, an estate, or a corporation.

(b) Parent subsidiary group of trades or businesses under common control —(1) General. The term "parent subsidiary group of trades or businesses under common control" means one or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest with a common parent organization if

(i) A controlling interest in each of the organizations, except the common parent organization, is owned (directly and with the application of § 11.414(c) 4(b)(1), relating to options) by one or more of the other organizations; and

(ii) The common parent organization owns (directly and with the application of § 11.414(c) 4(b)(1), relating to options) a controlling interest in at least one of the other organizations, excluding, in computing such controlling interest, any direct ownership interest by such other organizations.

(2) Controlling interest defined—(i) Controlling interest. For purposes of paragraphs (b) and (c) of this section, the phrase "controlling interest" means:

(A) In the case of an organization which is a corporation, ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation:

(B) In the case of an organization which is a trust or estate, ownership of an actuarial interest of at least 80 percent of such trust or estate:

(C) In the case of an organization which is a partnership, ownership of at least 80 percent of the profits interest or capital interest of such partnership; and

(D) In the case of an organization which is a sole proprietorship, ownership of such sole proprietorship.

(ii) Actuarial interest. For purposes of this section, the actuarial interest of each beneficiary of a trust or estate shall be determined by assuming the maximum exercise of discretion by the fiduciary in favor of such beneficiary. The factors and method prescribed in § 20.2031 10 of this chapter (Estate Tax Regulations) for use in ascertaining the value of an interest in property for estate tax purposes shall be used for purposes of this subdivision in determining a beneficiary's actuarial interest.

(c) Brother-sister group of trades or businesses under common control --(1) General. The term "brother sister group of trades or businesses under common control" means two or more organizations conducting trades or businesses if (i) the same five or fewer persons who are individuals, estates, or trusts own (directly and with the application of § 11.414(c)–4, singly or in combination, a controlling interest of each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization.

(2) Effective control defined. For purposes of this paragraph, persons are in "effective control" of an organization if

(i) In the case of an organization which is a corporation, such persons own stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote of such corporation or more than 50 percent of the total value of shares of all classes of stock of such corporation:

(ii) In the case of an organization which is a trust or estate, such persons own an aggregate actuarial interest of more than 50 percent of such trust or estate:

(iii) In the case of an organization which is a partnership, such persons own an aggregate of more than 50 percent of the profits interest or capital interest of such partnership; and

(iv) In the case of an organization which is a sole proprietorship, such persons own such sole proprietorship.

(d) Combined group of trades or businesses under common control. The term "combined group–of trades or businesses under common control" means any group of three or more organizations, if (1) each such organ-

§ 414(c).[14] Those regulations define a group "under common control" as a parent–subsidiary group, brother–sister group, or combined group. The regulations go on to define these terms according to the degree and nature of common stock ownership. The Ouimet Group, with the exception of Brockton, which was excluded by stipulation, clearly meets the test of stock ownership in the regulations. The group is, therefore, under common control for purposes of section 1301(b).

■ The apparent meaning of section 1301(b) is that a group under common control is to be treated as a single employer for purposes of subchapter III, which is entitled Plan Termination Insurance. It appears, then, that the term "employer," as used in section 1362(b), which is part of subchapter III, refers, in the case of a group under common control, to all the "trades or businesses" which are members of the group. Under this reading of the statute, all members of the Ouimet Group would be jointly and severally liable to PBGC.

Ouimet argues, however, that section 1301(b) does not mean what it appears to mean. Rather, in Ouimet's view, this language was intended only to prevent employers from avoiding application of ERISA by shifting employees around among various corporate entities. Ouimet maintains that, in the absence of section 1301(b), an employer could avoid application of ERISA by dividing into several corporations, each with less than twenty–five employees. Alternatively, an employer could shift an individual employee among corporations so as to minimize his length of service in any one corporation to avoid allowing his benefits to become vested.

■ Ouimet is correct in asserting that Congress intended to prevent such evasion of ERISA. It is clear, however, that this was accomplished through the anti–discrimination rules of Title II and the vesting and participation minimums under Title I. If

Congress had intended to limit the application of section 1301(b) to certain purposes, such as computing the number of employees for application of section 1321(b)(13), or the length of an employee's service for application of section 1322(b)(3)(A), it could have done so by referring specifically to the affected sections. Instead, Congress referred to "this subchapter." We must assume that Congress meant, by that phrase, the whole subchapter, including section 1362(b).

Ouimet argues that our reading of section 1301(b) renders section 1362(d)(2) superfluous. On this point, we agree with the district court's observation; since the definition of "parent" in the regulations under 26 U.S.C. § 414(c) is not incorporated into section 1362, there may be situations in which an employer is liquidated into a parent corporation which does not meet the definition of "parent" that is used to define a group under common control. In such a situation, section 1301(b) would not apply, and section 1362(d)(2) would be necessary to impose liability on the parent.

Ouimet also asserts that our reading of section 1301(b) is incompatible with section 1107(d)(7). Ouimet focuses on the words, "[a] corporation is an affiliate of an employer if it is a member of any controlled group of corporations . . . of which the employer who maintains the plan is a member," 29 U.S.C. § 1107(d)(7), and argues that this means that the employer cannot be the group. Again, we agree with the district court. This argument ignores the fact that section 1301(b) is in Title IV of the Act and applies only to subchapter III of that Title. The asserted incompatible language of section 1107(d)(7) is not in Title IV, let alone subchapter III. Defendants' construction mixes apples and oranges.

■ We do not think it necessary to track in detail each of Ouimet's other arguments against application of the plain meaning of section 1301(b), since we con-

---

ization is a member of either a parent-subsidiary group of trades or businesses under common control or a brother- sister group of trades or businesses under common control, and (2) at least one such organization is the

common parent organization of a parent–subsidiary group of trades or businesses under common control and is also a member of a brother -sister group of trades or businesses under common control.

sider them adequately addressed in the district court's opinion. We hold that the Ouimet Group, as a group under common control, is one employer for purposes of liability under section 1362.

We are not persuaded that, because only one of a group of corporations under common control contributes to a plan, it is unjust to make the group responsible for the plan's deficit. The facts of this case illustrate why such a group should be treated as an integrated whole. Ouimet purchased Avon with full knowledge of the plan and its funding requirements. Ouimet participated in the labor negotiations resulting in greater pension benefits that contributed to the deficit. The Ouimet Group filed a consolidated tax return on which the Avon contributions were deducted. We see nothing unfair in treating the Ouimet Group as a single employer.

We agree with the district court that the group under common control consists of Ouimet, Trust, Stay, Welting, and Avon/Tenn–ERO.

### Retroactivity

■ Defendants challenge the retroactive impact of ERISA for underfunding liability on both statutory and constitutional grounds. The Seventh Circuit confronted the same challenges in *Nachman Corp. v. Pension Benefit Guar. Corp.*, 592 F.2d 947 (7th Cir. 1979). Its decision upholding the retroactivity features of the Act on both grounds was appealed. The Supreme Court granted certiorari, but limited its review to the statutory question. *Nachman Corp. v. Pension Benefit Guar. Corp.*, —— U.S. ——, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). It stated the statutory question as follows:

> The question in this case is whether former employees of petitioner with vested interests in a plan that terminated the day before much of ERISA became fully effective are covered by the insurance program notwithstanding a provision in the plan limiting their benefits to the assets in the pension fund.

*Id.* at ——, 100 S.Ct. at 1726. It held that, despite the retroactive effect on the Nach-

man Corporation, the pension benefits were "nonforfeitable" and that PBGC had a statutory right to reimbursement from the employer. Since the pension plan in this case terminated prior to December 31, 1975, and contains language substantially identical to the language in the *Nachman* plan, defendants' statutory retroactive challenge is foreclosed by the Supreme Court decision in *Nachman. See* (Powell J., dissenting). *id.* at 1744.

The constitutional challenge to the retroactive effects of ERISA on defendants is based on due process grounds. The battle lines are drawn around redoubtable cases. Defendants rely primarily on *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), and *Railroad Retirement Bd. v. Alton R.R.*, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935). PBGC counters with *Usery v. Turner Elkhorn Mining*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). We agree with the Seventh Circuit that *Turner Elkhorn* carries the day.

■ The record supporting the enactment of ERISA, wholly unlike that present in *Allied Structural Steel*, demonstrates that "the presumption favoring 'legislative judgment as to the necessity and reasonableness of a particular measure'" must be allowed to govern here. 438 U.S. at 247, 98 S.Ct. at 2724. *Turner Elkhorn Mining*, 428 U.S. at 18, 19, 96 S.Ct. 2882; *Williamson v. Lee Optical Co.*, 348 U.S. 483, 488, 75 S.Ct. 461, [464] 99 L.Ed. 563 (1955). Title IV of ERISA satisfies Nachman's rights to Due Process.

*Nachman Corp. v. Pension Benefit Guar. Corp.*, 596 F.2d at 963. We note that the Supreme Court quoted extensively in a footnote the analysis the Seventh Circuit used to distinguish ERISA from the Minnesota statute in *Allied Structural Steel Co. v. Spannaus. Nachman Corp. v. Pension Benefit Guar. Corp.*, —— U.S. at —— n. 12, 100 S.Ct. at 1729 n. 12. We hold that, despite the retroactivity inherent in the Act, there is no constitutional due process violation.

## Waiver

To temper the immediate impact of ERISA on employers terminating plans, Congress authorized PBGC to issue full or partial liability waivers in cases of extreme hardship during the first two hundred seventy days after ERISA's enactment. 29 U.S.C. § 1304(f)(4).[15] During the two hundred seventy day period, PBGC promulgated no guidelines relative to waiver application procedures, but, on May 30, 1975, the final day of its temporary authority, it waived liability in most cases in which it had received a letter requesting a waiver. These waivers were contingent upon subsequent investigation into qualification for hardship status. The sole procedural requirement of section 1304(f)(4) is that the plan terminate during the applicable period. Fulfilling that requirement triggers eligibility for consideration of relief from liability.

On March 14, 1975, more than two months prior to the expiration of PBGC's temporary authority, Avon notified PBGC of its intent to terminate the plan on March 25, 1975. PBGC replied with a request for information about the plan and the reasons for its dissolution. Avon made a timely reply to the correspondence, outlining its poor financial condition. On May 29, 1975, Avon's plan administrator advised an Avon vice–president, Thomas Rosser, that Avon should forward a waiver request to PBGC "by registered mail on May 30." PBGC did not receive the letter, dated June 5, until the tenth of June and refused to consider the waiver request. The Ouimet Group now asserts that it is entitled to consideration for a hardship waiver, contending that it had no knowledge that PBGC would waive liability only if a specific request were made. It contends that the June 5th letter "indicates no more than the diligence of the actuary, who became concerned about the absence of any action by PBGC." Our reading of the record leads us to the contrary conclusion. The letter from the company plan administrator to Rosser states:

> Enclosed is a draft of the letter I mentioned in our telephone conversation which should be forwarded on Company stationery to the PBGC by registered mail on May 30, to meet the 270 day period from September 2, 1974.

It indicates that Avon knew PBGC had instituted a waiver–request procedure. Whether Avon learned this formally or informally, it failed to act during the requisite time period. Avon correctly states that the statute requires no specific request for a waiver; but, once it had knowledge of PBGC's housekeeping rules, it should have followed them. Moreover, as the district court pointed out, the Act allowed waiver by PBGC "for only the first 270 days" after enactment. 29 U.S.C. § 1304(f)(4). That period has passed.

*Affirmed.*

BOWNES, Circuit Judge (concurring specially).

While I agree with the panel, I think its statutory analysis, like that of the district court, is incomplete. It glosses over, without addressing, the main statutory problem–that ERISA recognizes two groups of businesses: businesses (whether or not incorporated) which are under common control, and a controlled group of corporations. Each is defined separately and treated separately under the Act. Unfortunately, the parties and the district court, to some degree, have used the terms interchangeably. Since the key question is whether the single employer definition of businesses under

---

**15.** 29 U.S.C. § 1304(f) in relevant portion provides:

> In addition to its other powers under this subchapter, for only the first 270 days after September 2, 1974, the corporation may— (4) waive the application of the provisions of sections 1362, 1363, and 1364 of this title to, or reduce the liability imposed under such sections on, any employer with respect to a plan terminating during that 270 day period if the corporation determines that such waiver or reduction is necessary to avoid unreasonable hardship in any case in which the employer was not able, as a practical matter, to continue the plan.

common control under section 1301(b) [16] brings the Ouimet Group within the liability provisions of section 1362(a),[17] and, since section 1301 does not refer to controlled groups of corporations at all, it is necessary to examine the Act to determine how both entities are treated and into which category the Ouimet Group falls.

Congress defined controlled group by adopting the Internal Revenue Code definitions of 26 U.S.C. § 1563(a) [18] which make stock ownership the test. It did not, at the time it passed ERISA, define groups under common control in terms of any existing provisions of the Internal Revenue Code. In section 1301(b), it provided that, under regulations prescribed by PBGC, all employees with trades or businesses under common control are to be treated as employed by a single employer. It further directed that the PBGC regulations "shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26."

The regulations promulgated by the Secretary of the Treasury *after* the enactment of ERISA under 26 U.S.C. § 414(c), *see* footnote 14, *supra*, defined groups under common control in the same terms as controlled groups. This, however, cannot change the separate treatment given these two entities under the Act.

The Ouimet Group fits into the definition of both entities; it is a group of businesses under common control and also a controlled group of corporations. The problem inherent in this dual role is that businesses under common control and a controlled group of corporations are not treated in the same manner throughout the Act.

That section defining a multiemployer plan states, "all corporations which are members of a controlled group of corporations . . . shall be deemed to be one employer." 29 U.S.C. § 1002(37)(B)(ii). There is no mention of trades or businesses under common control in this section of the

16. 29 U.S.C. § 1301(b) provides in pertinent part:

For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26.

17. 29 U.S.C. § 1362(a) provides in pertinent part: "This section applies to any employer who maintained a plan (other than a multi–employer plan) at the time it terminated[.]"

18. 29 U.S.C. § 1060(c) refers to 26 U.S.C. § 1563(a)(1)–(3) which contains the following definition of controlled group of corporations.

(a) Controlled group of corporations.–For purposes of this part, the term "controlled group of corporations" means any group of–

(1) Parent–subsidiary controlled group.–One or more chains of corporations connected through stock ownership with a common parent corporation if–

(A) stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of each of the corporations,

except the common parent corporation, is owned (within the meaning of subsection (d)(1)) by one or more of the other corporations; and

(B) the common parent corporation owns (within the meaning of subsection (d)(1)) stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of at least one of the other corporations, excluding, in computing such voting power or value, stock owned directly by such other corporations.

(2) Brother–sister controlled group.–Two or more corporations if stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of each of the corporations is owned (within the meaning of subsection (d)(2)) by one person who is an individual, estate, or trust.

(3) Combined group.–Three or more corporations each of which is a member of a group of corporations described in paragraph (1) or (2), and one of which–

(A) is a common parent corporation included in a group of corporations described in paragraph (1), and also

(B) is included in a group of corporations described in paragraph (2).

Act. Multiemployer plans are exempted from the liability provisions of 29 U.S.C. § 1362(a). Liability is imposed under 29 U.S.C. § 1364(a) on "all employers who maintain a plan under which more than one employer makes contributions at the time such plan is terminated . . ." Since the plan here is not multiemployer and since Ouimet is a controlled group, it can be argued that only the employer (the bankrupts) who maintained the plan are liable.

For purposes of minimum participation, vesting and benefit accrual, a controlled group and businesses under common control receive separate but equal tandem treatment under 29 U.S.C. §§ 1060(c) and (d).[19]

Disparate treatment of these entities does not, however, eliminate the common control definition of employer from the liability section of the Act. I would hold specifically that where, as here, there is a controlled group of corporations that also meets the definition of businesses under common control, section 1301(b) makes the group a single employer for liability purposes under section 1362(a).

---

19. 29 U.S.C. §§ 1060(c) and (d) provide:

(c) For purposes of sections 1052, 1053, and 1054 of this title, all employees of all corporations which are members of a controlled group of corporations (within the meaning of section 1563(a) of Title 26, determined without regard to section 1563(a)(4) and (e)(3)(C) of Title 26) shall be treated as employed by a single employer. With respect to a plan adopted by more than one such corporation, the minimum funding standard of section 1082 of this title shall be determined as if all such employers were a single employer, and allocated to each employer in accordance with regulations prescribed by the Secretary of the Treasury.

(d) For purposes of sections 1052, 1053, and 1054 of this title, under regulations prescribed by the Secretary of the Treasury, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer. The regulations prescribed under this subsection shall be based on principles similar to the principles which apply in the case of subsection (c) of this section.