BOWNES,
Circuit Judge.
This case is a sequel to Pension Benefit Guaranty Corp. v. Ouimet Corp., 470 F.Supp. 945 (D.Mass.1979), aff’d, 630 F.2d 4 (1st Cir.1980), cert, denied, 450 U.S. 914,101 S.Ct. 1356, 67 L.Ed.2d 339 (1981). In that case the district court held that the Employee Retirement Income Security Act (ERISA) authorizes the Pension Benefit Guaranty Corporation (PBGC) to impose liability for a pension plan termination jointly and severally on members of a commonly *1087 controlled group of businesses, and not just on the member that had established and contributed to the plan. We affirmed on somewhat different grounds and the case was remanded to the bankruptcy judge sitting as a master pursuant to Federal Rule of Civil Procedure 53 for a determination of the controlled group’s net worth. The bankruptcy judge’s net worth determination and ultimate allocation of liability among members of the commonly controlled group on remand have been affirmed by a district court order dated July 14, 1982, from which all of the parties now appeal. We find this allocation of liability to be erroneous as a matter of law and remand the case to the district court for determinations consistent with this opinion.
I. Facts and Prior Proceedings
As explained more fully in our first opinion, Ouimet, 630 F.2d at 6-7, this case concerns a group of business entities (the Oui-met Group) primarily owned, either directly or indirectly, by Emil R. Ouimet.[1] He, or in some instances his son, also served as president of each of these entities. The case commenced with the bankruptcy of two members of the Ouimet Group, Avon Corporation (Avon) and its wholly-owned subsidiary, Tenn-ERO.[2]
Avon became a member of the Ouimet Group in 1968 when its stock was purchased by the Ouimet Corporation. Nine years earlier Avon had established a pension plan for its hourly workers pursuant to a collective bargaining agreement. This plan gave Avon the right to “amend, modify, suspend or terminate [it]” and limited any benefits payable upon termination to “the assets then remaining in the Trust Fund.” Although Avon had made all actuarially required contributions, the plan was at all times underfunded because these contributions were insufficient to provide for all plan benefits.[3] This underfunding totalled $92,000 at the time Avon became a member of the Ouimet Group and $552,339.64 when Avon ceased operations in 1975.
In 1974 Congress established a system of pension plan termination insurance in Title IV of ERISA to guarantee the vested benefits of workers covered by defined benefits plans.[4] PBGC, the corporation created to administer the insurance program, in essence pays employees’ vested benefits to the extent that the terminated pension plan’s assets are insufficient to cover them. PBGC financies benefit payments by collecting insurance premiums from administrators of covered plans, 29 U.S.C. § 1301(a)(1) (Supp. V 1981), and by imposing reimbursement liability on the employer that terminated the plan, 29 U.S.C. § 1362 (1976 & Supp. V 1981). The employer liability provided for by section 1362 is limited to thirty percent of the employer’s net worth.[5] In our earlier opinion we held that, due to the plain meaning of the statutory language in *1088 29 U.S.C. § 1301(b) (1976),[6] the Ouimet Group constituted one employer for the purpose of employer liability under section 1362. Ouimet, 630 F.2d at 11-12. Thus, in determining the reimbursement liability resulting from Avon’s plan termination the net worth ceiling was to be measured by the aggregate net worth of the Ouimet Group and the various members of the Group were to be held jointly and severally liable to PBGC.
On remand the bankruptcy judge accepted PBGC’s determinations with respect to the valuation date[7] and method of valuing the Ouimet Group’s net worth,[8] and found that the Group’s net worth was sufficiently large that the thirty percent provision did not operate to reduce the $552,339.64 liability amount. He then accepted PBGC’s claim for interest on the liability from thirty days after the initial demand for payment up to the payment date at the rates provided under I.R.C. § 6621, but disallowed the imposition of interest against the bankrupt companies, Avon and Tenn-ERO. In determining the allocation of liability to each member of the Ouimet Group the bankruptcy judge noted that ERISA provides no explicit guidance on the issue and then attempted to make the allocation in a manner consistent with the congressional intent behind the statute. The judge acknowledged that the thirty percent of net worth limitation suggests that the bankrupts, having no net worth, could not be held liable, but rejected this suggestion apparently because ERISA give PBGC’s liability claim against an employer a priority status in bankruptcy proceedings. He finally arrived at an allocation based upon the thirty percent of net worth limitation; for the bankrupts, however, he substituted thirty percent of asset value for thirty percent of net worth. Based on ratios arrived at by dividing thirty percent of each member’s net worth and thirty percent of the bankrupts’ asset values by the total of thirty percent of the Group’s aggregate net worth plus thirty percent of the bankrupts’ asset values, the judge allocated liability as follows:
Ouimet Corporation $287,497
Ouimet Stay & Leather Company 95,832
Emil R. Ouimet Wareham Trust 90,508
Avon Sole Co. & Tenn-ERO 78.502
Total Liability to PBGC $552.339
The district court affirmed the bankruptcy judge’s judgment and memorandum in their entirety. On appeal the Ouimet Group advances several theories designed to reduce the termination liability or interest imposed on its remaining solvent members; some of these reductions would be at the expense of the bankruptcy estates of Avon and Tenn-ERO. PBGC and the Trustee in Bankruptcy have responded where appropriate and PBGC also has asserted that the court below erred in not allowing interest on the entire amount of the liability.
II. Reduction of Liability for Benefits Accrued Before Avon’s Membership in the Ouimet Group
The Ouimet Group’s first argument is that the joint and several liability of its *1089 members should be reduced by $92,000, the unfunded liability for vested benefits which had accrued under the pension plan before Avon became a member of the Group. This contention stems from our earlier holding that ERISA’s retroactive imposition of joint and several liability on Group members other than Avon was justified by virtue of their membership in the Group. The Group maintains that it follows from this that ERISA could constitutionally impose retroactive liability on other members only for the unfunded benefits attributable to the period during which Avon was a member.
PBGC responds to this argument primarily by stressing that the issue has already been litigated by the parties and decided by this court when we upheld the retroactive application of ERISA’s termination liability provisions based upon the reasoning of Nachman Corp. v. Pension Benefit Guaranty Corp., 592 F.2d 947 (7th Cir.1979) (retroactively upheld on statutory and constitutional grounds), aff’d, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980) (addressing the statutory question only). Indeed, the Ouimet Group’s current argument is strikingly familiar and relies on the same cases cited by it earlier — Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), and Railroad Retirement Board v. Alton Railroad, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935). We hesitate to dismiss the Group’s argument summarily, however, because it does contain some nuance of focusing on the liability accrued prior to Avon’s membership in the Ouimet Group. As PBGC acknowledges in its brief, the Ouimet Group did not specifically argue this point earlier.
Instead of relying upon cases that we distinguished in our earlier opinion, the Ouimet Group perhaps should have cited Pension Benefit Guaranty Corp. v. Anthony Co., 537 F.Supp. 1048 (N.D.Ill.1982), in advancing its current point. The court in Anthony considered the constitutionality of imposing employer liability on a parent whose subsidiary terminated a pension plan; the parent had acquired the subsidiary after the plan was established and before ERISA’s effective date. The court distinguished Nachman as upholding the statute’s retroactive application to direct employers. It held that liability could constitutionally be imposed on the direct employer’s parent only to a limited extent, concluding that it would be rational in due process terms to hold “the acquiring parent accountable for underfunding to the extent of any direct financial benefits it derived from the subsidiary during its affiliation.” Anthony, 537 F.Supp. at 1056 (footnote omitted). The court suggested that the parent could be held liable for such items as dividends it received from the subsidiary or income tax savings realized from deductions attributable to the subsidiary. By implication Anthony suggests that it would violate due process to hold the parent liable for unfunded benefits attributable to the period before it acquired the subsidiary because the parent would have received no financial benefits relating to this period.
We do not agree that rationality in due process terms requires a dollar by dollar accounting of the financial benefits controlled group members have realized as a result of their affiliation with the terminating employer. The mere fact that such benefits typically accrue in the controlled group setting is sufficient to support a conclusion that Congress acted rationally and not arbitrarily in drafting ERISA to impose retroactive liability on controlled group members. The circumstances surrounding the Ouimet Group amply demonstrate this. As we noted in our first opinion, Ouimet had agreed to benefit increases under the plan which contributed to its underfunding and the Ouimet Group realized tax benefits on the Avon plan contributions. Ouimet, 630 F.2d at 12. The analysis in Anthony ignored the realities of business affiliation, such as that a parent does not have to actually receive dividend payments to benefit from its subsidiary’s successful operations.
It does not require a quantum leap for us now to hold explicitly that imposing on the entire Group the $92,000 liability relating to the period before Avon was ac *1090 quired does not violate due process. The Ouimet Group does not have an indefeasible reliance interest here because it acquired Avon “with full knowledge of the plan and its funding requirements.” Ouimet, 630 F.2d at 12. Presumably the price at which Ouimet acquired Avon reflected the plan’s funding inadequacies up to that date — such as for past service costs — and thus Ouimet stepped into the shoes of Avon with respect to the benefits and burdens of the plan; certainly in most business acquisitions involving the purchase of stock this would be the case. More importantly, the Ouimet Group’s argument here runs counter to the essence of our first holding, that in enacting ERISA’s termination liability provisions Congress treated entities under common control as one employer. The statute places the Ouimet Group in the shoes of Avon regardless of the specifics of Ouimet’s acquisition of that company. This approach is rationally related to ERISA’s objectives of protecting employees’ retirement benefits while not creating disincentives to the adoption or liberalization of retirement plans. See Comment, Extending Liability for Pension Plan Terminations to Controlled Group Members: Pension Benefit Guaranty Corp. v. Ouimet Corp., 61 B.U.L. Rev. 447,489-502 (1981). Much of the analysis in Nachman Corp. v. Pension Benefit Guaranty Corp., 592 F.2d 947, concerning direct employers is pertinent here and supports the conclusion that due process does not require reducing the Ouimet Group’s liability by the amount of vested benefits accrued before Avon became a member.
III. Reduction of Liability Under Theories of Indemnity and Contribution
The Ouimet Group’s indemnity and contribution arguments reflect the same mis-perception of our earlier holding that commonly controlled entities constitute one employer for the purpose of termination liability. Underlying both of its contentions is the Group’s continued assertion that there are two classes of defendants to PBGC’s claims in this ease, the direct employers of the plan participants and the remaining members of the Group, and that the former class has primary liability while the latter is merely secondarily liable. Thus, the Oui-met Group argues that it is entitled to indemnification to the full extent of the $386,515.32 in the bankrupts’ estates. Under what it refers to as a contribution theory the Group offers two other possible allocations of liability. First, it maintains that the bankrupts’ estates should be applied first to the liability and that the Group should be jointly and severally liable for the balance. It appears that this approach would result in the same allocation as the indemnity theory: the bankrupts’ estates would be fully exhausted before the solvent companies could be held liable. In the alternative the Group argues for an allocation based on the comparative benefits yielded by the plan. It measures the benefits a business realizes from a pension plan by the number of months during which that business was connected with the plan. Given that the plan existed for 190 months and that Avon became affiliated with the Group after 112 of these months, the Group suggests that 112/190 of the liability be allocated to Avon and the remainder to the Group.
As often happens, these arguments confuse the concepts of indemnification and contribution. See W. Prosser, Law of Torts 310 (4th ed. 1971). To the extent that the Group seeks an allocation which requires each entity to pay its proportionate share of the liability it is requesting a right of contribution. See id. The notions of primary and secondary liability which underlie the Group’s claims, however, suggest that it is requesting indemnification. In any event, the real problem here is to allocate a liability which has been created by a federal statute. We find guidance in solving this problem in two recent Supreme Court cases — Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981), and Northwest Airlines, Inc. v. Transport Workers Union, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981). Not surprisingly, these cases suggest that we first determine if the statute, either expressly or by implication, provides the method of allocation. See Texas Indus *1091 tries, 451 U.S. at 638, 101 S.Ct. at 2065 (A right to contribution under the antitrust laws may arise in one of the following ways: “first, through the affirmative creation of a right of action by Congress, either expressly or by clear implication; or, second, through the power of the federal courts to fashion a federal common law of contribution.”); Northwest Airlines, 451 U.S. at 90-91, 101 S.Ct. at 1580 (similar statement with respect to the question of a right to contribution under the Equal Pay Act of 1963 and Title VII of the Civil Rights Act of 1964). Factors relevant to the analysis include statutory language, legislative history, and policy considerations. Id. at 89, 95, 101 S.Ct. at 1582.
The allocation to be made in this case is really one between the solvent members of the Ouimet Group and the creditors of the bankrupt companies, Avon and Tenn-ERO. The creditors’ claims significantly exceed the assets available in the bankruptcy estates and to the extent that assets from these estates are used to satisfy PBGC’s claim there will be an even smaller amount available to creditors. Hints of a solution to this allocation problem along the lines suggested by the Ouimet Group can be found in our first Ouimet opinion as well as in that of the district court. In an introductory discussion of the controlled group liability issue we stated that if the statute limited liability to the direct employer, Avon, then “PBGC [would] recover[ ] nothing and a dividend [would] be paid to the creditors.” Ouimet, 630 F.2d at 6. If the statute instead was construed to extend liability to other members of the Ouimet Group, we foresaw that it would be “probable that PBGC will receive all of the bankrupts’ assets with the creditors receiving nothing.” Id. Similarly, the district court speculated that “[b]y applying the net worth of the entire controlled group, the bankruptcy estate will probably be exhausted, and the unsecured creditors will receive little or no dividend.” Ouimet, 470 F.Supp. at 953 n. 19.
Now with the issue squarely before us, we do not think that the statutory provisions treating commonly controlled businesses as one employer should operate — by using the entire Group’s net worth in computing the thirty percent ceiling — to increase the liability amount and then allow the Group to pass as much of this increase as possible along to creditors of the bankrupts. It is true that the statute does not explicitly allocate liability among controlled group members which, under section 1301(b), are to be treated as a single employer. Ouimet, 470 F.Supp. at 953-54 n. 20. It is also true that when Congress wanted to allocate liability among employers participating in plans other than single-employer plans it did so explicitly. See, e.g., 29 U.S.C. § 1363 (1976 & Supp. V 1981) (providing a specific formula for allocating liability to the withdrawing employer and stating that this formula may be overridden by an “indemnity agreement in effect among all other employers under the plan”). These facts, however, do not negate the conclusion that allocation of the termination liability in this case to the creditors of Avon and Tenn-ERO cuts against the language and policies of the statutory scheme.
The thirty percent of net worth limitation clearly appears to eliminate the bankruptcy estates as a source of payment to PBGC because the estates have zero, actually negative, net worth. The bankruptcy judge recognized this but apparently could not reconcile it with the special priority status the PBGC claim receives in bankruptcy. The simple answer is that the provisions of 29 U.S.C. § 1368 (1976 & Supp. V 1981), which in essence create a lien similar to a tax lien, evidence the intent of Congress that as between PBGC and the bankrupt employer’s creditors the termination liability should be absorbed by the creditors. These provisions do not support the conclusion that as between controlled affiliates who are to be treated as a single employer and the direct employer’s creditors the loss is to be absorbed by the creditors.
Congress’ intent in enacting the net worth ceiling was to avoid imposing extreme economic hardship on employers and driving them to the brink of bankruptcy. *1092 Concomitantly, Congress also sought to avoid discouraging the establishment or liberalization of pension plans. H.R.Rep. No. 533, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 4639, 4654; S.Rep. No. 127, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 4838, 4862. The seriousness with which Congress considered these objectives is demonstrated by the fact that the conference committee reduced the ceiling to thirty percent of net worth from the fifty percent originally proposed in the House and Senate bills. There is simply no provision in the statute which authorizes PBGC to impose termination liability on an insolvent entity. The bankruptcy judge’s approach of substituting assets for net worth reads more into the statute than we are willing to accept.
Furthermore, the conclusion that the solvent members of the Ouimet Group, and not Avon’s creditors, should bear responsibility for the liability to PBGC follows from the objectives of imposing termination liability. These objectives, to deter employers from making unrealistic promises to employees and to protect against abuse of the termination insurance program, are illuminated by the following passage from the legislative history:
Concern was expressed to the committee that in the absence of appropriate safeguards under an insurance system, an employer might establish or amend a plan to provide substantial benefits with the realization that its funding may be inadequate to pay the benefits called for. Such an employer might, it was argued, rely on the insurance as the backup which enables it to be more generous in promising pension benefits to meet labor demands than would be the case if it knew that the benefits would have to be paid for entirely out of the assets of the employer.
S.Rep. No. 383, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 4890, 4971. Instead of relying on the insurance program as a backup, the Ouimet Group is trying to rely as much as possible on Avon’s creditors. This conflicts with the congressional intent of holding employers accountable for the pension benefits they promise to ensure that employees can safely rely on these promises in their retirement planning. This type of accountability is central to ERISA’s primary goal of protecting employees’ benefits. See A-T-O, Inc. v. Pension Benefit Guaranty Corp., 634 F.2d 1013, 1023 (6th Cir.1980); see also Comment, Extending ERISA Liability for Pension Plan Terminations to Controlled Group Members: Pension Benefit Guaranty Corp. v. Ouimet Corp., 61 B.U.L.Rev. 477, 489-502 (1981) (maintaining that holding controlled group members liable for plan terminations fosters the statute’s insurance objective and that such seemingly harsh treatment of employers does not produce the disincentives Congress sought to avoid). As we have indicated, the Ouimet Group participated in labor negotiations that resulted in promises of benefit increases and benefitted from Avon’s plan at the very least to the extent of deductions on its consolidated income tax returns. Under these circumstances we think the statute clearly requires that PBGC’s claim be satisfied out of the Group’s net worth, leaving the entire amount of the bankrupts’ estates for the satisfaction of creditors.
On the surface this result may appear to disregard unduly the legal separateness of the corporate entities involved.[9] There is precedent, however, for piercing the corporate veil in bankruptcy situations. Under its general equitable powers a bankruptcy court may “substantially consolidate” the assets and liabilities of various entities. Substantial consolidations will usually, but not always, involve only debtors and be granted if absolutely necessary *1093 for achieving reorganization or protecting creditors’ economic interests. See generally 5 Collier on Bankruptcy ¶ 1100.06 (15th ed. 1979). Some of the facts a court will look for in deciding whether to grant a substantive consolidation include the parent owning a majority of the subsidiary’s stock, the entities having common officers or directors, the subsidiary being grossly under-capitalized, the subsidiary transacting business solely with the parent, and both entities disregarding the legal requirements of the subsidiary as a separate corporation. Id. at 1100-35 (quoting Fish v. East, 114 F.2d 177, 191 (10th Cir.1940)); cf. DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681, 684-90 (4th Cir. 1976) (citing similar factors in concluding that officer/shareholder of indebted corporation could be held individually liable on the corporation’s debt).
There is no need to show that any or all of these factors are present to justify holding the solvent members of the Ouimet Group responsible for the entire liability in this case. Avon’s corporate veil was, in effect, pierced by Congress when it enacted the termination liability provisions of ERI-SA. The corporate form is a creation of state law and states may impose stringent limitations on attempts to disregard it; the factors courts consider in deciding whether to grant substantive consolidations reflect such limitations. These limitations, however, do not constrict a federal statute regulating interstate commerce for the purpose of effectuating certain social policies. See Sebastopol Meat Co. v. Secretary of Agriculture, 440 F.2d 983, 985 (9th Cir.1971) (state limitations on the “alter ego” doctrine need not be accepted in an agency’s application of federal regulatory statutes); Com Products Refining Co. v. Benson, 232 F.2d 554, 565 (2d Cir.1956) (existence of separate corporate entity may be disregarded when necessary to further the purpose of a federal regulatory statute). Thus, concerns for corporate separateness are secondary to what we view as the mandate of ERISA in this case.
IV. Composition of the Ouimet Group
The Ouimet Group next argues that the Supreme Court’s holding in United States v. Vogel Fertilizer Co., 455 U.S. 16, 102 S.Ct. 821, 70 L.Ed.2d 792 (1982), has altered the composition of the controlled group as originally determined by the district court in its first opinion. Specifically, the Group maintains that the Emil R. Ouimet Wareham Trust (Trust), which had been included in the controlled group because of its brother-sister relationship with other Ouimet companies, Ouimet, 470 F.Supp. at 947-49, should no longer be included in the Group. The exclusion of Trust and its net worth would reduce the Group’s termination liability by at least $6,000.
I.R.C. § 1563(a)(2), in pertinent part, defines a brother-sister relationship as existing between two corporations when five or fewer persons own at least eighty percent of the voting power of each corporation.[10] In invalidating a Treasury regulation promulgated under this section the Court in Vogel Fertilizer held that each person whose stock is considered in applying the eighty percent test must own at least one share of stock in each corporation. Vogel Fertilizer, 455 U.S. at 22-35, 102 S.Ct. at 826-32. The Ouimet Group maintains that this requirement has not been met with respect to Trust because Emil Ouimet, who is the sole owner of Trust, *1094 owns just under eighty percent of Ouimet Stay & Leather Company, a corporation which along with Ouimet Corporation had originally been held to have had a brother-sister relationship with Trust.
This argument misreads Vogel Fertilizer. Under that case’s holding, if Emil Ouimet did indeed own less than eighty percent of Ouimet Stay & Leather then that company would not be a member of the controlled group. Trust and Ouimet Corporation would remain in a brother-sister relationship as defined in Vogel Fertilizer because Emil Ouimet owned at least eighty percent of each of them. More importantly, we find that the controlled group as originally defined by the district court satisfies the Vogel Fertilizer requirement because Emil Ouimet in fact owned at least eighty percent of Ouimet Stay & Leather.
The principles of I.R.C. § 1563(a)(2) are relevant to controlled group plan termination liability because ERISA defines an employer in terms of the regulations promulgated under I.R.C. § 414(c). 29 U.S.C. § 1301(b)(1) (Supp. V 1981); see supra note 6 (text of provision). I. R.C. § 414(c) and the related regulations define controlled groups of businesses using the principles of the I.R.C. § 1563 definitions. See generally Comment, Extending ERISA Liability for Pension Plan Terminations to Controlled Group Members: Pension Benefit Guaranty Corp. v. Ouimet Corp., 61 B.U.L.Rev. 477, 491-02 (1981) (suggesting that the difference between section 1563 and section 414 is that the latter encompasses unincorporated as well as incorporated entities in the controlled group definitions and thus includes Trust). The family attribution rules set forth in the section 414(c) regulations operate to increase Emil Ouimet’s ownership percentage in Ouimet Stay & Leather to over eighty percent.[11] Under Temporary Treas.Reg. § 11.414(c)-4(b)(5) (1975), Emil Ouimet is deemed to own his wife’s six shares and under Temporary Treas.Reg. § 11.414(c)-4(b)(3) (1975), he is deemed to own almost seven shares from his father’s estate. These shares are sufficient to push his ownership interest in Ouimet Stay & Leather to over eighty percent without even considering the indications in the record that Emil Ouimet actually owns some more shares which are in the names of others. Thus, the same shareholder owns at least eighty percent of Trust, Ouimet Stay & Leather, and Ouimet Corporation and these entities are in a brother-sister relationship as defined in Vogel Fertilizer. Therefore, for the purpose of imposing termination liability the Ouimet Group includes Trust and remains as originally defined by the district court.
V. Interest Accrued During the Period the Liability Remains Unpaid
The district court affirmed the bankruptcy judge’s conclusion that interest should not accrue on that portion of the Ouimet Group’s termination liability allocated to the bankrupts. It follows from our holding here that interest should accrue on the entire amount of the liability because no amount is to be allocated to the bankrupts.
The Ouimet Group raises several points with respect to the amount of interest which should attach to its liability. First it argues that the statute does not provide for the imposition of interest, and that if interest is imposed it should not accrue until after this court issues its opinion and the amount of liability is conclusively determined. We think the statute clearly provides that PBGC may impose interest for an employer’s delay in satisfying its claim. See 29 U.S.C. § 1368(a) (1976) (providing for a lien in the amount of an employer’s “liability (including interest)" (emphasis added)); see also Ludlow Industries *1095 v. Pension Benefit Guaranty Corp., 524 P.Supp. 155, 158 (N.D.Ill.1981). This interest logically would begin to accrue on the plan termination date, the date on which the employer’s liability arises. Cf. 29 U.S.C. § 1368(b) (1976) (providing that the lien imposed when an employer neglects or refuses to pay arises on the plan termination date); 29 U.S.C. § 1362(b) (1976) (providing for computation of termination liability as of the termination date). Accruing interest as of the termination date is consistent with the idea that imposing interest will encourage prompt settlement of PBGC’s claims as well as compensate it for the time value of money foregone during any period of delay in payment. We note that PBGC’s regulations also encourage PBGC itself to facilitate a rapid determination and settlement of liability by imposing the same interest on PBGC for any over-payments made to it by the employer. 29 C.F.R. § 2622.7(b) (1982). The Ouimet Group has little room to complain because it has already been granted a one year delay beyond the termination date for the commencement of interest.
The Ouimet Group next cites Ludlow Industries, 524 F.Supp. 155, for the proposition that if interest accrues for its delay in payment, then for purposes of consistency the interest rate should be correlated with the factor used to discount the pension plan’s vested nonforfeitable benefits to present value in computing the termination liability. Thus, the Group maintains that if we approve PBGC’s imposition of interest for payment delays at short-term rates the termination liability should be recomputed using these same rates in discounting benefits. PBGC’s regulations have adopted the variable short-term rates provided in I.R.C. § 6621(a) for accruing interest on payment delays. 29 C.F.R. § 2622.7(c) (1982). Short-term rates are appropriate here on the theory that any delay in payment will not extend indefinitely. In effect, PBGC or the employer is being compensated for the short-term use of its money. On the other hand, long-term rates— which were used in determining the liability due at the termination of Avon’s plan — are appropriate in making the termination liability calculation because this involves discounting pension benefits that are scheduled to be received by employees over many years. There is no reason for the rates in these two calculations to be the same and we reject the Group’s argument that if we uphold, as we have, short-term interest rates for payment delay the termination liability amount must be redetermined to reflect discounting at the short-term rates. We find that PBGC’s regulation imposing interest at the I.R.C. § 6621(a) rates from the termination date implements the statute in a reasonable manner and is entitled to deference,.see Vogel Fertilizer, 455 U.S. at 24,102 S.Ct. at 827, and that these rates need not be incorporated into the liability determination.
Finally, we have considered and find no merit in the Ouimet Group’s other arguments with respect to interest, including the contention that the interest imposed pursuant to 29 C.F.R. § 2622.7(c) (1982) is a component of an employer’s termination liability and the total amount of liability and interest must be limited to thirty percent of net worth. Section 1362, which includes the thirty percent ceiling, clearly pertains solely to an employer’s liability for the current value of the plan’s unfunded vested benefits. See 29 U.S.C. § 1362 (1976 & Supp. V 1981). This amount, which is determined as of the termination date, is limited to thirty percent of net worth. Section 1368, which indicates that PBGC may impose an interest charge, addresses entirely different issues relating to satisfaction of PBGC’s claim that arise after the termination date. This straightforward reading of the statutory language does not eviscerate the net worth limitation when, as in this case, it exposes employers to potential interest charges which increase the total amount due to substantially higher than thirty percent of net worth because an employer may avoid such charges by paying its termination liability promptly.
In conclusion, we approve the bankruptcy judge’s allocation of termination liability *1096 among the solvent members of the Ouimet Group according to ratios using thirty percent of their net worth amounts. This case must be remanded, however, to allocate to these solvent companies the liability originally allocated to the bankrupts. Interest on the reallocated liabilities should be computed in a manner consistent with this opinion.

Remanded.

. For a diagram of the relationship of these businesses, see Ouimet, 470 F.Supp. at 947 n. 1.

. For all practical purposes these two entities were one and the same; they have been treated as such throughout the proceedings involved in this case.

. More specifically, the underfunding existed because (1) the plan gave credit for past years of service without requiring immediate contributions to fund these credits, (2) Ouimet negotiated several benefit increases but failed to fund them with current contributions, and (3) the value of fund investments declined during the years immediately before the plan’s termination. Ouimet, 630 F.2d at 7.

. For the current codification of this insurance system, see 29 U.S.C. §§ 1301-1461 (1976 & Supp. V 1981).

. The statute sets out the amount of liability as follows:
Any employer to which this section applies shall be liable to the corporation, in an amount equal to the lesser of—
(1) the excess of—
(A) the current value of the plan’s benefits guaranteed under this subchapter on the date of termination over
(B) the current value of the plan’s assets allocable to such benefits on the date of termination, or
(2) 30 percent of the net worth of the employer determined as of a day, chosen by the corporation but not more than 120 days prior to the date of termination, computed without regard to any liability under this section.
29 U.S.C. § 1362(b) (1976).

. The relevant language in this section, which has remained unchanged by subsequent amendments to the section, is as follows:
For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of title 26.
29 U.S.C. § 1301(b)(1) (Supp. V 1981).

. The statute requires PBGC to choose a valuation date that is not more than 120 days before the termination date. See supra note 5 (text of provision). PBGC selected December 31, 1974, as the valuation date in this case.

. In relevant part 29 U.S.C. § 1362(c) (1976 & Supp. V 1981) provides that, for the purposes of computing an employer’s liability, net worth is “determined on whatever basis best reflects, in the determination of the corporation, the current status of the employer’s operations and prospects at the time chosen for determining the net worth of the employer .... ” In this instance PBGC concluded that a fair market valuation was the most appropriate measure of net worth.

. Perhaps this explains why the Trustee in Bankruptcy failed to press for this result on appeal and instead acceded to the allocation of the bankruptcy judge. The Trustee had argued below that it followed from the thirty percent of net worth ceiling that the solvent members of the Group should pay the liability in proportion to their net worth and that the bankrupts should bear no liability.

. The text of I.R.C. § 1563(a)(2) is as follows: Brother-sister controlled group Two or more corporations if 5 or fewer persons who are individuals, estates, or trusts own (within the meaning of subsection (d)(2)) stock possessing—
(A) at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock of each corporation, and
(B) more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value-of shares of all classes of stock of each corporation, taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation.

. We reject the Ouimet Group’s contention that under Vogel Fertilizer the family attribution rules can only apply to stock owned by persons who own stock of each of the entities under consideration. The attribution rules set out in I.R.C. § 1563(d) & (e) clearly do not include such a requirement. Vogel Fertilizer invalidated Treasury regulations which were inconsistent with other portions of § 1563 and clearly had no effect on that section’s attribution provisions.