**PENSION BENEFIT GUARANTY CORP., Plaintiff,**

and

**International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), Robert Foster, and Eugene Lewis, Intervening Plaintiffs,**

v.

**DIAMOND REO TRUCKS, INC. et al., Defendants.**

No. G78–389–CA5.

United States District Court, W. D. Michigan, S. D.

March 19, 1981.

Henry Rose, Bernard Klein, and Lawrence Landgraf, Washington, D. C., for Pension Benefit Guaranty Corp.

Alan Reuther, Detroit, Mich., for all intervening plaintiffs.

Dennis S. Kayes, Hertzberg, Jacob & Weingarten, Detroit, Mich., for Diamond Reo Trucks, Inc., and Lloyd Kempf, Trustee for Diamond Reo Trucks, Inc.

Joseph A. Fink, Lansing, Mich., and Daniel O. Berger, Paxton & Seasongood, Cincinnati, Ohio, for all other defendants.

## OPINION

BENJAMIN F. GIBSON, District Judge.

This matter has come before this Court on motions for summary judgment filed by all defendants. Each defendant claims that Plaintiff Pension Benefit Guaranty Corporation's construction and application of Sections 4001(b), 4062(b), and 4062(c) of Title IV of the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA") in this case constitutes an improper exercise of discretion and authority granted to that party under ERISA, and therefore entitles defendants to judgment in their favor as a matter of law. Plaintiff Pension Benefit Guaranty Corporation (hereinafter "PBGC") and all intervening plaintiffs vigorously oppose defendants' motions and argue that PBGC's construction and application of the aforementioned statutes in this case is proper and is entitled to deference on plenary review. As a matter of fact, all parties have agreed that the resolution of the motions pending in this case hinges on an interpretation of the term "net worth" as that term is used in Section 4062(b) of ERISA, 29 U.S.C. § 1362(b). For all of the reasons which follow, this Court agrees with the plaintiff and the intervening plaintiffs on this critical issue, and defendants' motions for summary judgment are denied.

In deciding the motions for summary judgment in this case, the defendants, as the moving parties, bear the burden of clearly establishing the nonexistence of any genuine issue of any fact material to judgment in its favor. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the defendants have succeeded in this showing, the plaintiff and the intervening plaintiffs "may not rest upon the mere allegations or denial of [their] pleading[s]," but must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.R. 56(e). For the purposes of this motion, evidentiary matter submitted has been taken at "face value." *Begnaud v. White*, 170 F.2d 323, 326–27 (6th Cir. 1948); *McPike v. Die Casters Equipment Corp.*, 504 F.Supp. 1056 (W.D.Mich.1980).

In deciding the questions before this Court, all inferences drawn from underlying facts contained in the affidavits, exhibits, pleadings, admissions, and answers to interrogatories were viewed in a light most favorable to the plaintiff and the intervening plaintiffs. *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Adickes v. S. H. Kress & Co., supra*, 398 U.S. 144, 158 at n. 15, 90 S.Ct. 1598, 1608 at n. 15 (citing cases); *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir. 1962). This Court is required to view this matter in a light most favorable to the plaintiff and the intervening plaintiffs, for even if the basic facts are not in dispute,

summary judgment is not appropriate when contrary inferences may be drawn from those facts. *United States v. Diebold, Inc., supra; Equal Employment Opportunity Commission v. United Association of Journeymen & Apprentices, Etc.*, 427 F.2d 1091, 1093 (6th Cir. 1970); *Provencal v. Michel Construction, Inc.*, 505 F.Supp. 770 (W.D. Mich.1980).

▮ In deciding this case, the Court further accorded the decisions of PBGC due deference. As the agency charged with the responsibility of administering ERISA, its decisions must be given deference when reviewed by the courts. *A–T–O, Inc. v. Pension Benefit Guaranty Corp.*, 634 F.2d 1013, 1020 (6th Cir. 1980); *Connolly v. Pension Benefit Guaranty Corp.*, 581 F.2d 729, 730 (9th Cir. 1978), *cert. denied* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979).

*Factual Background*

The Court has digested all of the affidavits and representations of all parties in attempting to decide the propriety of summary disposition of this case. It appears from those materials that Diamond Reo Trucks, Inc., maintained various pension plans for the benefit of its employees. These pension plans are covered by the insurance program set forth in Title IV of ERISA. On December 6, 1974, Diamond Reo filed for reorganization under Chapter XI of the Bankruptcy Act. After numerous attempts to reorganize the corporation proved unsuccessful, Diamond Reo was adjudicated a bankrupt as of the close of business on May 31, 1975. Thereafter, Diamond Reo was released from liability as to all dischargeable debts. *In re Diamond Reo Trucks, Inc.*, No. BG 74–1778 B 5 (W.D. Mich.1975).

The pension plans established by Diamond Reo were terminated on May 31, 1975, by mutual agreement of Diamond Reo and PBGC. PBGC later determined that the aggregate deficiency among the various Diamond Reo pension plans exceeded $14 million dollars. Since the date of the termination of Diamond Reo's pension plans, PBGC has been paying all guaranteed benefits to the participants in these plans as provided in Title IV of ERISA.

Section 4062(b) of ERISA allows PBGC to hold any "employer" liable to PBGC for the lesser of two statutorily-defined amounts.[1] 29 U.S.C. § 1362(b). In this case, PBGC has decided to use the formula outlined in Section 4062(b)(2), which under its theory of the case would hold the defendants liable for 30 percent of the "net worth" of the "employer" determined as of the day chosen by the PBGC, but not more than 120 days prior to the date of termination of the pension plans, computed without regard to any liability under Section 4062. 29 U.S.C. § 1362(b)(2). Section 4001 defines "employer" for Title IV purposes as follows: "[A]ll employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer." 29 U.S.C. § 1301(b). The First Circuit recently expanded on this "single employer" concept, and although this circuit has yet to address questions relating to this aspect of Title IV of ERISA, this Court considers the First Circuit's opinion as indicative of the path this circuit likely will follow in the future. *Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 630 F.2d 4, 11 (1st Cir. 1980), *cert. denied* —— U.S. ——, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981).

Cappaert Enterprises has been named as a party-defendant by the PBGC on the the-

---

1. Section 4062(b) provides:
   Any employer to which this section applies shall be liable to the [PBGC], in an amount equal to the lesser of—
   (1) the excess of—
   (A) the current value of the plan's benefits guaranteed under this subchapter on the date of termination over

(B) the current value of the plan's assets allocable to such benefits on the date of termination, or
(2) 30 percent of the net worth of the employer determined as of a day, chosen by the [PBGC] but not more than 120 days prior to the date of termination, computed without regard to any liability under this section.
29 U.S.C. § 1362(b).

ory that it and Diamond Reo have been under "common control."[2] Although Cappaert denies that it should be included under the "single employer" theory urged by the PBGC, it has invited the Court to assume PBGC's allegation in this regard to be true for the purposes of deciding the motions for summary judgment. Brief of Defendant Cappaert Enterprises in Support of Motion for Summary Judgment, p. 2. For the purposes of considering defendants' motions for summary judgment, therefore, the Court has considered Diamond Reo and Cappaert Enterprises as a "single employer" within the meaning of ERISA, a presumption which is consistent with the requirement that this Court draw all inferences in a light most favorable to the plaintiffs and non-moving parties.

Having determined that Cappaert Enterprises and Diamond Reo constituted a "single employer" as defined above, the PBGC concluded that the "net worth" of the entire group should be considered when ascribing liability under Section 4062(b)(2). In doing so, the PBGC decided that Diamond Reo's "net worth" should be valued at zero, for it was a bankrupt corporation with all of its debts having been discharged by a bankruptcy court. *See* Stipulation, No. G78–389–CA5 (W.D.Mich., November 21, 1980).[3]

The defendants contend that PBGC's decision to compute Diamond Reo's "net worth" in the manner just outlined violated the plain meaning of ERISA and constituted an improper exercise of discretion and authority granted to PBGC by Congress through ERISA. The defendants contend that the "negative net worth" of Diamond Reo must be factored into any equation if all of the defendants are to fall under the aegis of "single employer" for the purposes of assessing liability under Section 4062(b)(2) of Title IV of ERISA. In other words, the defendants would have this Court require PBGC to calculate the defendants' collective "net worth" as a "single employer" by reducing any positive amount by the excess of liabilities over assets appearing on financial statements prepared for Diamond Reo at the time of its discharge in bankruptcy as of May 31, 1975. Based on the information before this Court, PBGC determined that the collective "net worth" of this "single employer" in this case amounted to nearly $11.5 million. Diamond Reo's liabilities exceeded its assets as of May 31, 1975, by nearly $14.2 million. Thus, if the defendants were correct on the issue of calculating "net worth" for Section 4062(b)(2) purposes, then PBGC would not be allowed a recovery because the aggregate "net worth" of the "single employer" for ERISA purposes would be less than zero, and 30 percent of nothing is nothing.

**2.** The Court has chosen to use the term "Cappaert Enterprises" for the sake of convenience and economy in rendering this opinion. The PBGC has named as parties-defendant the following companies, claiming that each of them and Diamond Reo were members of a group of trades or businesses under the common control of F. L. Cappaert: Rivertown Contractors, Inc., Administrative Services, Inc., Warrentown Heights Utility Co., Inc., Cappaert Enterprises, Cappaert Investment Corporation, Business Aviation Services, Inc., and Prestige Travel Enterprises, Inc.

**3.** The parties' stipulation, to which the PBGC and Cappaert Enterprises are signatories, states:

Plaintiff Pension Benefit Guaranty Corporation ("PBGC") and defendants Rivertown Contractors, Inc., Administrative Services, Inc., Warrentown Heights Utility Co., Inc., Cappaert Enterprises, Cappaert Investment

Corp., [and] Business Aviation Services, Inc., by their undersigned counsel, hereby stipulate and admit that the PBGC valued defendant Diamond Reo Trucks, Inc. at zero for the purposes of determining the "net worth of the Employer" as those terms are used in Paragraph 21 of its Complaint.

In Paragraph 17 of its complaint, PBGC alleges that all defendants, except the trustee in bankruptcy for Diamond Reo, were members of a group of trades or businesses under the common control of F. L. Cappaert, and in Paragraph 18 of the complaint, the PBGC defines "Employer" as all defendants under common control and to be treated as a "single employer" under Section 4001(b), 29 U.S.C. § 1301(b), for the purposes of ascribing liability under Section 4062(b)(2), 29 U.S.C. § 1362(b)(2). In Paragraph 21 of its complaint, the PBGC alleges that "[t]he net worth of the Employer as of May 31, 1975, was not less than $11,473,000."

*Analysis*

■ This Court was inundated with various arguments regarding the policy of ERISA and how PBGC's construction of the term "net worth" would either promote or frustrate the purposes intended by Congress in passing ERISA. This Court also was provided with a vast amount of arguably expert opinion in the form of affidavits, all of which fundamentally addressed the question of the propriety of favoring one way of using "negative net worth" figures of a bankrupt corporation over any number of other ways of using such information. Although the Court has reviewed all of these materials thoroughly, it cannot say that any of these materials assist the Court in making its decisions on defendants' motions for summary judgment. When all of the dust clears, all that the parties need do is look to the language contained in Title IV of ERISA itself. All other information serves only to cloud or confuse the issue. The Court at this stage of these proceedings must focus its inquiry only on whether as a matter of law the PBGC may *not* interpret "net worth" for Section 4062(b)(2) purposes in the way in which it has been interpreting that term in this case. Since the Court determines that the PBGC's interpretation is within the scope of the PBGC's authority under ERISA, and since that interpretation is entitled to due deference, defendants' motions for summary judgment are denied.

The premise of defendants' argument is that the term "net worth" as used in Section 4062(b)(2) of ERISA can mean only "assets minus liabilities." Unfortunately, defendants have failed to accord due consideration to the balance of Title IV in determining Congress's intent in using the term "net worth" in Section 4062(b)(2). Concomitantly, defendants apparently fail to recognize that a term used by Congress in a statute may have different meanings depending on the statute involved, particular-

ly where the statute expressly or implicitly defines that term. The Court is required to decide the meaning of "net worth" *for ERISA purposes.*[4] Congress itself has lent a hand in this regard by including Section 4062(c) in Title IV. That statute provides:

> For the purposes of [Section 4062(b)(2),] the net worth of an employer is
>
> (1) determined on *whatever basis best reflects, in the determination of the [PBGC], the current status of the employer's operations and prospects* at the time chosen for determining the net worth of the employer, and
>
> (2) increased by the amount of any transfers of assets made by the employer determined by the [PBGC] to be improper under the circumstances, including any such transfers which would be inappropriate under [the Bankruptcy Act] if the employer were a debtor in a case under chapter 7 of [that Act].

29 U.S.C. § 1362(c), as amended (emphasis supplied). It is clear from this provision that Congress has given the PBGC wide discretion in determining "net worth" of employers for Section 4062(b)(2) purposes. Such determinations do not fall within the province of the PBGC's unfettered discretion, however, for Congress has set forth a standard by which the PBGC is to assess "net worth" for Section 4062(b)(2) purposes. In using the phrase "on whatever basis best reflects ... the current status of the employer's operations and prospects," it is apparent that Congress intended that the PBGC be flexible—but not unreasonable or arbitrary—in determining "net worth" for Section 4062(b)(2) purposes. This Court believes that the language contained in Section 4062(c) simply demonstrates a congressional intent to require the PBGC to disdain mechanical formulae in favor of adopting flexible standards whereby an employer's true ability to sustain the expense of Section 4062(b)(2) liability may be measured.

---

4. The Court agrees with the defendants that the ordinary meaning of a term employed by Congress should be presumed when construing a statute. *See, e. g., Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). However, where Congress has defined—ex- pressly or implicitly—a term for the purposes of a particular statute, courts will abide by those definitions. In this case, the Court believes that the term "net worth" has been defined sufficiently by Congress.

The legislative history of ERISA and Section 4062(c) confirms the plain language and intent of that statute. The original bills which passed the House of Representatives and the Senate each contained provisions that employers who terminated pension plans could be liable to the PBGC for a percentage of their "net worth." [5] However, the bills differed in defining "net worth" for Section 4062(b)(2) purposes. The House version contained no indication of how "net worth" was to be calculated, but the Senate version contained a specific formula for determining "net worth." [6]

The House-Senate conference committee adopted language less mechanistic than that proposed by the Senate, and that language became the present version of Section 4062(c)(1). [7] 29 U.S.C. § 1362(c)(1), as amended. The House-Senate conference committee report explained that "net worth" for Section 4062(b)(2) purposes should be "determined on the basis chosen by the [PBGC] to reflect best the operating value of the employer." [8] Given the legislative history of Sections 4062(b)(2) and 4062(c)(1), therefore, it is clear to this Court that Congress rejected *both* the notion of

---

5. *See* H.R. 2, as amended, 93d Cong., 2d Sess., § 414(b) (1974), III Legislative History of the Employee Retirement Security Act of 1974, at 4038 (G.P.O. ed. 1976); H.R. 2, as amended, 93d Cong., 2d Sess., § 462(b) (1974), III Legislative History of the Employee Retirement Security Act of 1974, at 3725–26.

6. *See* H.R. 2, as amended, 93d Cong., 2d Sess., § 414 (1974), III Legislative History of the Employee Retirement Security Act of 1974, at 4038–39; H.R. 2, as amended, 93d Cong., 2d Sess., § 462(c) (1974), III Legislative History of the Employee Retirement Security Act of 1974, at 3726. The Senate version of ERISA defined "net worth" as follows:

(1) [I]n the case of a corporation whose stock is traded on a national exchange, the aggregate value of such corporation's stock, and

(2) in the case of any other employer, the fair market value of its assets less its liabilities determined in a manner *consistent with section* 2031 of the Internal Revenue Code of 1954.

*See id.*

7. *See* Conf.Rep.No.93–1280, 93d Cong., 2d Sess., III Legislative History of the Employee Retirement Security Act of 1974, at 4639, 4643. *See also* note 8, *infra.*

8. Conf.Rep.No.93–1280, 93d Cong., 2d Sess., at 376, *reprinted in* [1974] U.S.Code Cong. & Ad. News, at 4639, 5155. The following excerpts from the legislative history of Title IV of ERISA are pertinent in this case:

Both the House bill and the Senate amendment required employer liability for insurance payments made by the corporation be*cause of terminations of the employers'* plans. The House bill set a limit on employer liability of 50 percent of the employer's net worth, as compared with 30 percent under the Senate amendment. In addition, the House bill did not impose any liability in the case of multiemployer plans.

As previously discussed, both the House bill and the Senate amendment authorized the corporation to insure employers against employer liability, under different sets of conditions.

Under the conference substitute, employer liability is required for employers in both single-employer and multiemployer plans. The employer liability is limited to 30 percent of net worth, with net worth valued as of the date chosen by the [PBGC], but not more than 120 days prior to the termination.

Net worth is to be computed without taking the contingent employer liability into the calculation. It is determined on the basis *chosen by the [PBGC] to reflect best the* operating value of the employer, and it is to be increased by any transfers made by the employer prior to the termination that the [PBGC] finds improper.

In determining the employer who may be liable for insurance coverage losses of the [PBGC], all trades or businesses (whether or not incorporated) under common control are to be treated as a single employer. Trades or businesses under common control may, for this purpose, include partnerships and proprietorships as well as corporations.

In determining the amount of the corporation's liability, the amount of employer liability (but not the employer's net worth), the application of the lien arising out of employer liability, the appropriate allocation *of assets* in the event of a termination, the value of the plan's assets, the amount of benefits payable with respect to each participant, the amount of benefits guaranteed with respect to each participant, the present value of the aggregate amount of benefits potentially payable by *the corporation,* and the fair market value of the plan's assets, the date of determination is to be the date of termination.

In determining the fair market value of a plan's assets, unrealized gain is to be taken into account.

*Id.*

not defining "net worth" at all *and* the notion of adopting a mechanistic formula to compute "net worth." Instead, Congress opted for giving the PBGC broad discretion in this area so that the "net worth" of any employer would reflect the earnings potential of that employer, *viz.*, "the current status of the employer's operations and prospects at the time chosen for determining the net worth of the employer." [9] 29 U.S.C. § 1362(c)(1), as amended.

■ As stated previously, the Court must give due deference to the determination of the PBGC in this matter. *A–T–O, Inc. v. Pension Benefit Guaranty Corp., supra; Connolly v. Pension Benefit Guaranty Corp., supra.* In deferring to the wisdom of the PBGC on this question, the Court aligns itself with the fundamental principle that "the construction of the statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *E. I. du Pont de Nemours & Co. v. Collins,* 432 U.S. 46, 55, 97 S.Ct. 2229, 2234, 53 L.Ed.2d 100 (1977). The Court is not persuaded that there exist any compelling indications that the PBGC erred in determining that Diamond Reo's "net worth" for Section 4062(b)(2) purposes shall be zero. Congress has given the PBGC a wide range of discretion in determining the "net worth" of an employer, and the PBGC is entitled to its autonomy in making at least the initial determination in this regard. If the PBGC

---

**9.** In an attempt ostensibly to standardize the procedure by which the PBGC would exercise its discretion in determining the "current status of the employer's operations and prospects at the time chosen for determining the net worth of the employer," the PBGC has promulgated proposed regulations. *See* 45 Fed.Reg. 34899–34907 (May 23, 1980, No. 102). "The effect of the regulation if adopted would be to provide needed guidance with respect to the calculation and payment of an employer's statutory liability." 45 Fed.Reg. at 34900. Section 2613.4(a) of the proposed regulations defines a "general rule" for determining an employer's "net worth." That section would provide:

> An employer's net worth is equal to the fair market value of the employer determined at the discretion of the PBGC, as of the net worth record date established pursuant to § 2613.5, and includes those assets that PBGC determines pursuant to Paragraph (c) of this section to have been improperly transferred. The PBGC's determination will be based on its review and analysis of the factors set forth in Paragraph (b) of this section.

45 Fed.Reg. at 34905. Subsection (b) proceeds to define various factors which the PBGC would consider—and apparently now does consider—in determining an employer's "net worth." Additionally, the PBGC states that "different factors may be considered with respect to different portions of the employer's operations," and the PBGC will consider "[a]ny other factor [which] PBGC finds to be relevant in determining the employer's net worth." Proposed PBGC Regulation, § 2613.4(b) and § 2613.4(b)(9), 45 Fed.Reg. at 34905. Inasmuch as these regulations have not been approved, the Court is not in a position to pass on the propriety of the aforementioned sections therein. The Court notes, however, that the defendants challenge the PBGC's *de facto* implemen-

tation of these regulations in this case, arguing that the PBGC has no power to substitute "fair market value" for "net worth" in ascribing Section 4062(b)(2) liability. Supplemental Brief in Support of Motion for Summary Judgment, pp. 2–7. In light of Section 4062(c), this Court's inquiry must focus on whether or not the method used by the PBGC to determine the "current status of the employer's operations and prospects at the time chosen for determining the "net worth" of the employer" exceeds its authority in this case. Congress has given the PBGC considerable latitude in making these decisions. Absent a showing that the PBGC acted arbitrarily or unreasonably in this case, this Court is loathe to upset a course of conduct which Congress obviously wished to enact and follow. Such a blueprint for the PBGC is evident from the statute itself and its legislative history. *See* text of opinion accompanying notes 5–8, *supra.* Thus, the Court here holds that the PBGC is not statutorily prohibited from construing the term "net worth" as it has done consistently in this case. In the trial of this cause, however, the PBGC will have to demonstrate to this Court that its application of Sections 4001, 4062(b)(2), and 4062(c)(1) is reasonable under these circumstances, is consistent with the purposes of ERISA, and does not amount to arbitrary attempts to hold various defendants liable without a legitimate basis for doing so. Therefore, whether or not "fair market value" assessments in this case are reasonable will depend on the facts to be adduced through discovery and at trial. The PBGC eventually will have to show how its method of calculating the "net worth" of the "employer" herein best reflects the operating value of that "employer."

believes that Diamond Reo's "net worth" should be treated as zero for the purposes of ascribing liability to the Section 4001 "employer" under Section 4062(b)(2) in this case, and if such a determination is consistent with Congress's instruction that the PBGC's determination be made so as to offer a realistic picture of the financial status of the "employer" in question, then this Court would find nothing wrong with the PBGC's actions.[10]

Defendants have argued strenuously that this Court's denial of defendants' motions for summary judgment would amount to a condoning of the PBGC's "unrealistic" attempt to group all entities under common control under the rubric of "single employer," yet not accounting for the massive debt structure under which one of the members of that common group operates. Defendants' argument in this regard, however, misses the apparent purpose of Title IV of ERISA. Congress evidently wanted the PBGC to look beyond mere arithmetic calculations resulting in valuing "net worth" as the "excess of assets over liabilities." Congress intended that the PBGC look into the realistic expectations that an employer in question would be able to shoulder Section 4062(b)(2) liability. The Court does not "condone" any conduct by the PBGC in this case. Rather, the Court merely applies a statutory scheme set in motion by Congress, and the Court simply decides that the defendants have not established as a matter of law that PBGC may not consider Diamond Reo's "net worth" as zero for Section 4062(b)(2) purposes.[11]

Defendants also argue that the First Circuit has indicated that "negative net worth" should be used by the PBGC in determining Section 4062(b)(2) "net worth" where multiple employers arguably "under common control" for Section 4001 purposes are involved. Defendants contend that *Pension Benefit Guaranty Corp. v. Ouimet Corp., supra,* stands as authority for the proposition that "negative net worth" can be used too in multiple-employer settings, even where use of this concept may relieve the "employer" of liability to PBGC. Defendants cite one sentence in *Ouimet* as authority for this position: "Following a twelve-day trial in December, 1976, the bankruptcy judge recommended that no liability attach to the [Ouimet] Group and that Avon/Tenn-ERO's negative net worth relieved them of liability to PBGC." *Pension Benefit Guaranty Corp. v. Ouimet Corp., supra,* 630 F.2d at 8. In light of the *dicta* contained in other parts of the *Ouimet* opinion,[12] this Court cannot agree with defend-

10. PBGC argues that even under accounting principles, Diamond Reo's "excess liabilities" would not be deducted from values of affiliated entities. Defendants have contended that basic accounting principles would require the "negative net worth" of Diamond Reo to be considered in valuing the overall "net worth" of all companies controlled by one person or entity. PBGC argues that professional standards in the accounting field would prohibit any attempt to consolidate the assets and liabilities of one or more ongoing concerns with those of an affiliated bankrupt. PBGC makes the tenable argument that when one consolidates healthy companies with bankrupt concerns, the value of the bankrupt should be considered as zero, for any debts owed by the bankrupt have been discharged and the healthy companies would be liable for those debts only if they guaranteed those obligations or otherwise committed themselves to providing further financial support for the bankrupt. *See* Affidavit of Robert M. Klein, ¶¶ 5 and 6. These are additional factors which the Court must consider during the trial of this matter. The Court's determina-

tion of the reasonableness of PBGC's valuing Diamond Reo's assets at zero for Section 4062(b)(2) purposes may be judged in light of the accounting principles to which reference has been made in this footnote.

11. Of course, a question still remains as to whether or not the PBGC may consider Cappaert Enterprises as a group of companies "under common control" and falling within the definition of "single employer" for ERISA purposes, 29 U.S.C. § 1301(b). This Court's review of the file in this matter also reveals substantial dispute concerning many valuation issues. *See, e. g.,* Statement of Disputed Facts, ¶¶ 10, 13, 14, 15.

12. In the proceedings leading to the district court's decision in *Ouimet*, a bankruptcy judge found that the bankrupts' estate had assets of $374,000 and unsecured claims against it amounting to $2.2 million. The Ouimet group contended that once the "negative net worth" of the bankrupts was subtracted from the Ouimet group's net worth, 30 percent of the total

ants' reading of *Ouimet.* This Court believes that Sections 4001, 4062(b), and 4062(c), when read in concert, confer a wide range of discretion on the PBGC such that the PBGC would be free to refrain from incorporating the notion of "negative net worth" into its calculations if a realistic portrayal of an "employer's" ability to sustain Section 4062(b)(2) liability would not result. Neither *Ouimet* nor any of the other cases touching on the issues raised in this Court support the position urged by the defendants in this regard.

*Conclusion*

For all of the foregoing reasons, defendants' motions for summary judgment are denied. All parties are admonished to complete discovery in this matter as swiftly as possible in light of this opinion and order, and all parties shall report in writing to this Court to communicate the progress of discovery in this case. In view of this ruling by the Court, all parties shall make diligent efforts toward completing all discovery, including any requests for admissions, not later than July 31, 1981. The parties will be notified in due course of the scheduling of a pretrial conference in this matter.

IT IS SO ORDERED.

net worth could not exceed $195,000. The district court reversed the bankruptcy judge's ruling that only the "direct employer" of each plan could be liable under Section 4062(b), and remanded the case to the bankruptcy judge for further consideration in light of the fact that ERISA imposes joint and several liability on all members of a controlled group of corporations. *Pension Benefit Guaranty Corp. v. Ouimet Corp.,* 470 F.Supp. 945, 954, 958 (D.Mass.1979).

The First Circuit's *dicta* contradicts defendants' position in this case and supports the theory that Congress conferred on the PBGC a wide range of discretion in using or not using "negative net worth" in its calculations. This Court believes that the statute allows PBGC to refrain from employing the "negative net worth" concept in its calculations if a realistic

portrayal of an "employer's" ability to sustain Section 4062(b)(2) liability would not result. The *Ouimet* court may have been signaling such a result when it postulated the practical effect of its ruling in the following terms: "If ... 'employer' is construed to mean the Ouimet Group of corporations, including the bankrupts, it is probable that PBGC will receive all of the bankrupts' assets with the creditors receiving nothing." *Pension Benefit Guaranty Corp. v. Ouimet Corp., supra,* 630 F.2d at 6. However, this Court need not consider the First Circuit's *dicta* in this case, for the Court holds that nothing in ERISA precludes the PBGC from following any reasonable and rational course of conduct consistent with Sections 4001, 4062(b)(2), and 4062(c)(1). *See also* notes 9 and 10, *supra.*