In re TENN–ERO CORPORATION, Avon Sole Company, Bankrupts.

PENSION BENEFIT GUARANTY CORPORATION, Plaintiff,

v.

TENN–ERO CORPORATION, Avon Sole Company and Herbert C. Kahn, Trustee, Defendants.

PENSION BENEFIT GUARANTY CORPORATION

v.

OUIMET CORPORATION, Ouimet Stay & Leather Company and Ouimet Welting Company.

Bankruptcy Nos. 75–1520–HL, 75–1521–HL.

United States Bankruptcy Court, D. Massachusetts.

Oct. 15, 1981.

Sidney Werlin, Boston, Mass., for trustee.

Herbert C. Kahn, Boston, Mass., trustee.

Friedman & Atherton, Richard G. Maloney, Maloney, Williams & Baer, P. C., Boston, Mass., for Ouimet Group.

Paul F. Ware, Goodwin, Proctor & Hoar, Boston, Mass., for PBGC.

## MEMORANDUM ON REMAND

HAROLD LAVIEN, Bankruptcy Judge.

On remand of these proceedings, counsel have been given an opportunity to submit additional evidence and have all declined; they have submitted additional memoranda referencing previously filed briefs and pertinent portions of the record. The Court has examined the material submitted, reviewed the transcript and makes the following findings and rulings.

As a threshold issue[1] the Court must determine the standard of review to be applied to the determinations of the Pension Benefit Guaranty Corporation (PBGC) of the date and method to be used in valuing the combined net worth of the Ouimet Group as previously defined by the Court of Appeals. *Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 630 F.2d 4 (1st Cir. 1980) cert. denied 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981) as well as the ultimate net worth of the group. PBGC by statute (29 U.S.C. § 1362) cannot assert its admitted claim of $552,339.64 against more than 30 percent of the net worth of the group. Therefore, in order for PBGC to be entitled to collect its entire claim, the net worth of the group must equal or exceed $1,841,132.10.

■ This Court is limited by law in the extent it can review the determination of the PBGC. The determination by PBGC to use December 31, 1974 as a valuation date under § 4062(b)(2)[2] of the Employment

---

1. For these issues the Trustee, Creditors' Committee, and Ouimet's counsel, share a common interest. Once the amount due PBGC is established, its interest in proceedings becomes largely academic as all of the parties are jointly and severally liable. It then becomes a dispute between the Trustee and Creditors' Committee of Avon Sole and Tenn-Ero v. the Ouimet Group.

2. 29 U.S.C. § 1362

(b) Any employer to which this section applies shall be liable to the corporation, in an amount equal to the lesser of—

(2) 30 percent of the net worth of the employer determined as of a day, chosen by the corporation but not more than 120 days prior to the date of termination, computed without regard to any liability under this section.

Retirement Income Security Act (ERISA) and its determination that a fair market valuation best reflects the employer's economic condition under § 4062(c)(1)[3] of ERISA cannot be reviewed by the Court, since they each fit into the standardless discretion exception to judicial review for administrative agencies. Were it open, I would neither find these agency choices an abuse of discretion nor would I intend to imply that they were the only justifiable choices. *Davis Associates, Inc. v. Secretary, Dept. of Hous. & U. D.*, 498 F.2d 385 (1st Cir. 1974); *Hahn v. Gottlieb*, 430 F.2d 1243 (1st Cir. 1970).

■ This Court does, however, have a limited right to review PBGC's determination of the net worth of the controlled group. ERISA does not require an agency hearing prior to the agency determination of net worth. PBGC, on page 31 of their initial Memorandum of Law, conceded the employer's right to trial de novo and, in fact, a 12-day trial was held.

The instant case is similar to those in which the Supreme Court has held that *de novo* court review of agency action satisfies due process. The PBGC, without any prior evidentiary hearing, assessed a liability against the Bankrupts and the Ouimet Group. To enforce collection of that assessment, the instant court action has been necessary. 29 U.S.C. § 1368(d). Therefore, this Court, in offering all parties the opportunity to present their cases, must consider the evidence presented *de novo*. *Ewing v. Mytinger & Casselberry*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); *Lichter v. United States*, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) *Nickey v. Mississippi*, 292 U.S. 393, 54 S.Ct. 743, 78 L.Ed. 1323 (1934).

In light of the *de novo* hearing requirement, the Court's scope of review of the PBGC's action is fairly broad. To the extent necessary to its decision, the Court "shall decide all relevant questions of law, interpret constitutional and statutory provisions and determine the meaning or applicability of the terms of an agency action." APA § 10(e), 5 U.S.C. § 706. The Court shall set aside an agency action if it is, *inter alia*, arbitrary, capricious, contrary to constitutional right or "unwarranted by the facts to the extent that the facts are subject to a trial de novo by the reviewing court." *Id.*

■ The standards for this Court's scope of review must take into account that the agency has already acted, albeit without a hearing. Even the Court's *de novo* reception of evidence cannot ignore the agency's findings. Thus, unless the weight of the evidence presented in the *de novo* hearing compels a contrary finding, the Court must uphold the agency action. It is the burden of the aggrieved party to establish that the agency action complained of violates statutory or procedural requirements or is unwarranted according to the weight of the evidence. *Redmond v. United States*, 507 F.2d 1007 (5th Cir. 1975).

The evidence on fair market value was hotly contested and like most valuation evidence, left the Court at times wondering if both sides were dealing with the same companies since the experts seemed to have no common ground. The valuation process was best described by the Ouimet Group expert as not a "scientific exercise but a matter of judgment." He characterized his two approaches not in technical terms such as capitalization of a projected earnings stream, (which really magnifies the speculation by multiplying an assumption by a guess) comparable company analyses, weighted average of prior earnings ratios, ratios of prior years' profitability trends, or discounted cash flow, all calculated to imply a mathematical provability, but simply as a practical businessman's approach and a theoretical approach. How much more appeal-

---

**3.** 29 U.S.C. § 1362

(c) For purposes of subsection (b)(2) of this section the net worth of an employer is—
(1) determined on whatever basis best reflects, in the determination of the corpora-

tion, the current status of the employer's operations and prospects at the time chosen for determining the net worth of the employer . . .

ing is Mr. Spaulding's approach in determining ratios and value: "which of these companies would you rather put your money in? Why?"

Valuation is a problem faced by all courts and daily by bankruptcy courts where it is recognized that an estimate without "mathematical certitude" is all that can be achieved in determining future earning capacity for valuation purposes. *In re King Resources Co.,* 651 F.2d 1326 (10th Cir. 1980).

In the matter of arriving at fair market value of ongoing or liquidating business, this Court would doubt that in 1976 it had less expertise than this newly created agency with its extremely inexperienced expert, Mr. Fults, who apparently got most of his opinions on comparable price-earnings ratios and projected earnings, as of December 31, 1974, from conversations with a former securities analyst and, admittedly, made no attempt to find out what the market indicators anticipated the future earnings to be. Were the Court free to determine this matter without being required to support the administrative agency as long as all of the evidence would at least warrant its determination, the Court would reach a somewhat different result.

■ In a matter as nebulous as valuing a closely held nonpublicly traded, relatively small business, I cannot say there isn't sufficient evidence to warrant the method and result arrived at by Mr. Fults and, therefore, the agency determination in all but one aspect is warranted by the record. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *Pension Benefit Guaranty Corporation v. Diamond Reo Trucks, Inc.,* 509 F.Supp. 1191, 1195 (W.D.Mich.1981). Because I find Mr. Spaulding more persuasive when he is not talking about book value, his conclusions as to fair market value are substantially closer to how I might be inclined to find.

The Ouimet Group suggests that various provisions give the Bankruptcy Court broader powers to determine for itself claims against the estate, and they point to the tax claim cases. *Helvering v. Taylor,* 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Pizzarello v. United States,* 408 F.2d 579 (2nd Cir. 1969); *Compton v. United States,* 334 F.2d 212 (4th Cir. 1964). To be even more persuasive, they might have pointed to the discharge cases where state court and administrative agency determinations are sometimes discarded by the Bankruptcy Court based on the doctrine of exclusive control of the bankrupt's property, and the concept of the debtor's fresh start. *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); *Brown v. Felson,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); *Comm. of Massachusetts v. Hale,* 618 F.2d 143 (1st Cir. 1980); *In re Winters,* 586 F.2d 1363 (10th Cir. 1978); *In re Jack Eskenazi,* 6 B.R. 366, 6 B.C.D. 1140 (9th Cir. Bkrtcy.App. Panel 1980). These cases are the progeny of the Supreme Court's decision in *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). As appealing as that approach is, it is not applicable to the present problem. If the contest existed as to the agency claim of $552,339.64, that line of cases might well apply; however, the claim is conceded, and the issue presented concerns the nonbankruptcy ameliorating provision of ERISA which limits recovery to 30% of net worth of the control group. 29 U.S.C. § 1362.

In one area, Mr. Fults' evaluation is not supported by the evidence and cannot stand; that is the failure to apply any discount for the contingent liabilities. The negative net worth, if there is such a term, does not get subtracted because we are not concerned with accountant's numbers, but the likely effect of the liabilities in the marketplace. Whatever the bankrupt companies' losses, they had already occurred and would not directly effect asset value. *See Pension Benefit Guaranty Corporation v. Diamond Reo Trucks, Inc.,* 509 F.Supp. 1191 (W.D.Mich.1981). Note, however, that case is at least distinguishable in that the liquidating company was already in bankruptcy on PBGC's chosen date. Here, the

date on which value must be determined is December 31, 1974, and Avon Sole/Tenn-Ero didn't file in bankruptcy until June 18, 1975. While it is true that anyone buying on December 31 would have had 100% control, and thus could immediately file and need not wait until June, any prudent investor has to contemplate that once bankruptcy is filed, the consequences are not only unknown but not under his control. The existence of a $1,000,000 bank loan guarantee, a $200,000 purchase money mortgage guarantee on machinery, and a long-term lease guarantee present contingent liabilities all subject to how well some presently unknown trustee does in liquidation. Even if the purchaser tries to liquidate to avoid bankruptcy, he would be subject to unknowns including potential involuntary bankruptcy. Companies with these contingent liabilities have to be less desirable than companies without them. The Court accepts Mr. Spaulding's analysis of these liabilities except that the Ouimet Group should be entitled to a set-off of its $270,000 debt.

Thus, the Court finds fair market value of the control group to be $2,670,000 less $337,000, Spaulding's valuation of the contingent liabilities less the set-off, making the net fair market value of the control group as employer, $2,333,000.

Since the amount necessary to allow PBGC its full claim is $1,841,132.10, the 30% provision does not benefit the control group and liability to PBGC is for the full $552,-339.64. I would note in passing that even if Spaulding's figures *were accepted*, the result would not be substantially different. Spaulding's valuation for Ouimet Corp. is between $975,000 and $1,137,500. The Trust's admitted net worth figure is $570,-000. While Spaulding did not perform a valuation of Ouimet Stay & Leather, he did refer to Fults' valuation approach which used the same price-earnings ratio for Ouimet Corp. and Ouimet Stay & Leather. Spaulding had previously found that ratio to be 3 to 3.5 which, as applied to the $120,000 in projected earnings, would produce a value between $360,000 and $420,000, yielding a total Spaulding valuation minimum of $1,845,000 and maximum of $2,067,-500. Even if we deduct Spaulding's $337,-000 for contingencies, we would then come to a minimum of $1,508,000 or a maximum of $1,730,500. If the Court determined the fair market value to be $1,600,000, 30% of net worth would produce a liability of $480,-000. Of course, all of this is premised on the previous finding that PBGC can appropriately establish the method of valuation to be fair market value and not book value. If Spaulding's book value approach were to be accepted, then the value of the Ouimet Group would be about one-half or $800,000.

In § 4068 (29 U.S.C. § 1368) ERISA seems to contemplate interest from demand to payment, and the only case to have thus far considered the issue so rules. *Ludlow Industries, Inc. v. Pension Benefit Guaranty Corporation*, 524 F.Supp. 155 (N.D. Ill.1981). The logic of allowing interest is compelling when one considers that the purpose of reimbursement is to replace the funds the Agency is required to spend to provide the agreed benefits to the employees. This amount is computed in part by reducing the long-term undertaking to present value which will then be made up by earned interest over the term. PBGC claims and is entitled to interest from the Ouimet Group from 30 days after initial demand for payment March 5, 1976 to the date of payment at the rates established under 26 U.S.C. § 6621 until payment; namely 7% for the period March 5, 1976 to January 31, 1978, 6% for the period February 1, 1978 to January 31, 1980, and 12% from February 1, 1980 to date of actual payment. However, there will be no interest against the Bankrupts since post-petition interest is not allowed in bankruptcy, *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 163, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946), and the original bankruptcy petition was filed on June 18, 1975. Any rights as a lien creditor would not alter PBGC's lack of a right to interest from the bankrupt estate since the liened property of the Debtor would not be equal to or larger than the secured debt. Fur-

thermore, at least as to the bankrupt estate, the claim would not be a lien claim in any event, since it arose if at all by virtue of 29 U.S.C. § 1368 after demand made on March 5, 1976—nine months after the filing when the property was in the exclusive control of the Bankruptcy Court and Trustee's title had intervened. PBGC refers to § 1368(c) and tax liens, but a close reading of that section provides for priority not necessarily lien status.

■ The next issue the Court must determine is the extent of liability of each member of the control group. Clearly, under ERISA, all members of the control group are jointly and severally liable. See 29 U.S.C. §§ 1301(b), 1362(b); Pension Benefit Guaranty Corp. v. Ouimet Corp., 630 F.2d 4, 11 (1st Cir. 1980) cert. denied 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981). However, just as clearly, ERISA provides no guidance in determining the appropriate allocation of liability between members of the group and, therefore, in light of the statutory void, the Court has the responsibility of determining the appropriate allocation in accordance with traditional equitable principles considering each case on its particular facts and with a view to carrying out to the extent that it is evident and possible the Congressional intent.

First and foremost, PBGC should be paid. Considering the net worth values and the funds in the bankruptcy estate that should be accomplished with no further delay or expense, leaving any dispute to be settled between members of the group.

Arguments of marshalling, cross-claims, subrogation to PBGC's rights are all interesting and tempting but would only perpetuate the controversy and create a lawyers' playground. ERISA has enunciated the 30% limitation of net worth in § 4062 reflecting a congressional intent supported by the Act's history of wanting to limit recovery so as not to crush the employer. See House Rep. No. 93–533 (1974), reprinted in U.S.Code Cong. & Ad.News 4639, 4654. Although this would seem to eliminate the bankrupt estate, ERISA then used the control group concept which not only did not eliminate the bankrupt but expressly gave the ERISA claim special priority status in bankruptcy. Assuming without deciding that marshalling against a government agency is appropriate, see, e. g., United States v. LeMay, 346 F.Supp. 328 (E.D.Wis. 1972); United States Fidelity & Guaranty Co. v. Long, 214 F.Supp. 307 (D.Or.1963), and the control group could be classed as the common debtor holding two funds,[4] namely equity funds and bankruptcy estate funds, the Court could then order PBGC to collect first against the equities. If that occurred, those who paid would then attempt to assert their claims against the estate in the priority position of PBGC, and the Court would have to decide if there was such a right.

What is the equitable and practical solution? First, let us understand that we are not dealing with parties primarily and secondarily liable. Both sides can claim to be victims of the "but for" test. But for the bankrupts' underfunded pension plan, the Ouimet Group would not be liable. But for the Ouimet Group's equity, the Bankrupts would not be subject to an enforceable claim. Neither party is liable because of any contractual, tort or common law breach of duty. Both parties are primarily and only liable because of ERISA and, as found by the First Circuit, rightfully and equitably so.

4. Marshalling requires that the funds sought to be marshalled belong to a common debtor. Farmers & Merchants Bank v. Gibson, 7 B.R. 437, 439 (Bkrtcy.N.D.Fla.1980). In the instant case, the Court would have to decide whether the Ouimet Group and the bankrupt corporation are to be treated as a common debtor. At this time, the Court makes no decision as to when it is appropriate to pierce the corporate veil and have a creditor marshal against the stockholders. See In re Jack Green's Fashions for Men—Big and Tall, Inc., 597 F.2d 130 (8th Cir. 1979) (Individual shareholder's assets marshalled for the benefit of corporate creditors). But cf. In re United Medical Research, Inc., 12 B.R. 941 (Bkrtcy.C.D.Cal.1981) (Courts may not marshal stockholder's individual property where there was no evidence of a fraud, overreaching or other inequitable conduct).

The facts of this case illustrate why such a group should be treated as an integrated whole. Ouimet purchased Avon with full knowledge of the plan and its funding requirements. Ouimet participated in the labor negotiations resulting in greater pension benefits that contributed to the deficit. The Ouimet Group filed a consolidated tax return on which the Avon contributions were deducted. We see nothing unfair in treating the Ouimet Group as a single employer... *Pension Benefit Guaranty Corporation v. Ouimet Corporation*, 630 F.2d 4, 12 (1st Cir. 1980).

 If one party were to pay the full liability, it could seek contribution from the other parties. The right to contribution, where one person discharged more than his just share of a common burden, did not arise from contract, but had its foundation in, and was controlled by, principles of equity and natural justice. *Chaffee v. Jones* (1837) 36 Mass. 260, 19 Pick. 260; *Mason v. Lord* (1838) 37 Mass. 447, 20 Pick. 447. Massachusetts law provides that there exists a right to contribution in the case of joint and several debtors who are principles if their obligations are equal in kind and degree. *Capodilupo v. McCormack*, 315 F.Supp. 526 (D.Mass.1970). Under Massachusetts tort law, the effect of joint liability is that each defendant is liable for the entire amount of damages due the Plaintiff. However, if a joint tortfeasor pays more than his pro rata share of the judgment, he has a right to contribution from other joint tortfeasors for the excess. Mass.Gen.Laws Ann. ch. 231B (Uniform Contribution Among Tortfeasors Act). However, each party's liability should not be equal under the ERISA claim, because of the express intent of Congress to limit liability according to an employer's net worth. ERISA § 4062, 29 U.S.C. § 1362. The equitable solution requires that no party should pay more than 30% of its net worth or equity as previously determined by the Court. Even though the Bankrupts have no net worth or equity, the congressional purpose to limit the owners to a loss of 30% is still an applicable analogy. In the case of a liquidating bankrupt the creditors are, in a real

sense, the owners of the estates' assets and the assets become their equity, therefore, to have them contribute a maximum of 30% of the asset value of the estate would place them in a comparable and equitably equivalent position. A ratio of 30% of the net worth of each member of the Ouimet Group and the Bankrupts' equivalent over 30% of the net worth of the entire Ouimet Group plus 30% of the assets of the bankruptcy estate (total assets equal $386,515.32 as of November 5, 1981) applied to the claim of PBGC will give each entity's share as follows:

| | |
|---|---|
| Ouimet Corporation | $287,497 |
| Ouimet Stay & Leather Co. | 95,832 |
| Emil R. Ouimet Wareham Trust | 90,508 |
| Avon Sole Co. & Tenn-Ero Corp. | 78,502 |
| | $552,339 |

Interest on the above debts shall be calculated as specified above, but the bankrupt estate will be eliminated. The Trustee is to pay its share, forthwith, and PBGC is to proceed, first against each member of the Ouimet Group for the indicated shares and, if not paid within 60 days, PBGC is then free to proceed as it wills. However, any entity that declines to make its appropriate pro rata payment or acceptable arrangements for the payment of the same within the allocated time will be responsible for all collection costs, including attorney's fees, of any other entity that pays more than its proportionate share and has to recover the excess.