PENSION BENEFIT GUARANTY
CORPORATION, Plaintiff,

v.

WEST SIDE BAKERY, INC. and Ropp
Realty Corporation, Defendants.

No. 89 Civ. 1637 (WK).

United States District Court,
S.D. New York.

July 25, 1990.

Reargument Denied Sept. 20, 1990.

As Amended Sept. 21, 1990.

Deborah Stover–Springer, Pension Ben. Guar. Corp., Office of the Gen. Counsel, Washington, D.C., for plaintiff.

John A. Vasile, McGovern, Connelly & Davidson, New Rochelle, N.Y., for defendants.

## MEMORANDUM & ORDER

### WHITMAN KNAPP, District Judge.

Pension Benefit Guaranty Corporation ("PBGC") moves for summary judgment on its ERISA claims. For reasons which follow, the motion is granted in part and denied in part.

### BACKGROUND [1]

Defendant West Side Bakery, Inc. ("West Side") is a closely held corporation owned and operated by Rocco, Phillip and Pasquale Cassone ("the Cassone brothers"), who together also own Ropp Realty Corporation ("Ropp Realty") from which West Side rents its bakery premises. The relationship between the two entities goes beyond common ownership. As noted by PBGC, Ropp Realty's major asset is the building in which West Side operates its bakery, and Ropp Realty has cross-guaranteed several of West Side's debts.

In 1976, West Side established its retirement income plan ("the Plan"), naming the Cassone brothers as the Plan's trustees. From as early as 1980, West Side experienced financial difficulties. On January 13, 1983, in response to its persistent financial woes, it sold its trade name and customer lists [2] and the next day filed for bankruptcy under Chapter 11. Soon thereafter it ceased its operations, laid off all employees, and filed a notice of intent to terminate the Plan. In August, when the purchaser of its assets had failed to make payments under the sales agreement, West Side reacquired its assets and resumed business. In so doing, it allegedly incurred start-up costs of $75,000, most of which was financed by a mortgage of Ropp Realty's property.

On September 7, 1983, West Side and the Cassone brothers (in their capacities as trustees of the Plan) entered into an agreement with PBGC appointing it successor trustee and fixing March 4, 1983 as the date of the Plan's termination ("DOPT"). West Side's Chapter 11 petition was dismissed on September 25, 1985.

PBGC has attempted since 1983 to collect (1) due and unpaid employer contributions ("DUECS") from West Side, and (2), from West Side and Ropp Realty, "employer liability" arising out of the Plan's termination. Its efforts to resolve these matters without resort to litigation are well-documented in its papers. On March 10, 1989, it commenced this action, and now moves for summary judgment.

## DISCUSSION

### I. *PBGC's Claim for DUECS.*

Defendant West Side has not challenged PBGC's authority as statutory trustee to collect DUECS, nor has it contested PBGC's claim for interest on them. In its responsive papers, it opposes PBGC's motion solely on the ground that PBGC failed to set forth its calculations in its moving papers. Thus, West Side asserts, it is unable meaningfully to rebut PBGC's calculation which "seems to be pulled from the air without any factual support."

This contention is disingenuous. Prior to bringing this action, PBGC's Chief of its Actuarial Operations Branch sent to West Side correspondence—which West Side has admitted receiving (*see* Answer at ¶ 10)—showing how the figures had been computed.

---

1. The uncontroverted facts set forth in this section are derived from the pleadings and from PBGC's memorandum and its Local Rule 3(g) statement. Defendants' submissions in opposition to the motion set forth no factual background, nor do they include a Local Rule 3(g) statement.

2. The purchaser of these assets was Cassone Bakery, Inc., which defendants' counsel advised us at oral argument bears no relation to the Cassone brothers.

More importantly, in its reply papers, PBGC fully apprised West Side of its method of calculating the DUECs it seeks to collect. At oral argument, apparently unprepared to dispute PBGC's calculations, West Side indicated that, because it had received PBGC's reply papers only three days earlier, it required additional time to review the calculations therein contained. In the several weeks that this motion has been *sub judice*, West Side has had ample opportunity to challenge PBGC's calculations, but has not done so. Accordingly, we grant summary judgment in the amount of $45,932 plus interest in favor of PBGC on its claim for DUECS.

## II. *The Employer Liability Claim.*

PBGC's claim for employer liability is governed by 29 U.S.C. §§ 1301(b)(1) and 1362(b).[3] Section 1301(b)(1) defines "the employer" against which PBGC may assess employer liability, and section 1362 addresses the question of whether or not such liability exists and, if so, in what amount.

### A. The "Employer"

■ Section 1301(b)(1) provides that all trades or businesses "under common control" shall be treated as a single employer, and leaves to PBGC the responsibility of defining "under common control" in its regulations. The applicable regulation prescribed by PBGC incorporates by reference section 414(c) of the Internal Revenue Code and the regulations promulgated thereunder. 29 C.F.R. § 2612.2. Therefore, for the purpose of determining employer liability, trades or businesses under common control are defined as:

two or more organizations conducting trades or businesses, if (i) the same five or fewer persons who are individuals ... own ... a controlling interest in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization.

26 C.F.R. § 1.414(c)–2(c).

Pursuant to the above, PBGC has determined that "the employer" comprises both West Side and Ropp Realty. That determination is not subject to challenge. As PBGC asserts (and defendants do not dispute), on the DOPT, the three Cassone brothers each owned a one-third share in West Side and Ropp Realty and effectively controlled them both.

### B. Employer Liability

■ At all times relevant to this action, section 1362(b) provided that, upon termination of a retirement plan, PBGC could hold the "employer" liable for the lesser of: (1) the plan's asset insufficiency and (2) 30% of the net worth of the "employer." 29 U.S.C. § 1362(b).[4] Thus, when a plan's asset insufficiency exceeds 30% of the employer's net worth, liability under this section is limited to that amount, and if the net worth of the employer is zero or a negative number, there can be no such liability. The parties agree that the Plan's asset insufficiency[5] exceeds the net worth of the employer, and that PBGC's claim is

---

3. ERISA has undergone substantial revision in recent years. However, these amendments have no bearing on this litigation. Accordingly, all citations to ERISA are to the Act as it existed prior to these amendments.

4. 29 U.S.C. § 1362(b) provides:
Any employer to which this section applies shall be liable to [PBGC], in an amount equal to the lesser of—
(1) the excess of—
(A) the current value of the plan's benefits guaranteed under this title on the date of termination over

(B) the current value of the plan's assets allocable to such benefits on the date of termination, or
(2) 30 percent of the net worth of the employer determined as of a day, chosen by the corporation but not more than 120 days prior to the date of termination, computed without regard to any liability under this section.

5. According to PBGC's calculations, because the Plan provided for guaranteed benefits of $81,561.00 but had assets of only $1,708.37, the Plan had an asset insufficiency of $79,832.63.

therefore limited to 30% of the employer's net worth.

■ Under the statute, the employer's net worth is "determined on whatever basis best reflects, in the determination of [PBGC], the current status of the employer's operations and prospects at the time chosen for determining the net worth of the employer." 29 U.S.C. § 1362(c). Thus, the statute grants PBGC broad discretion in determining how an employer's net worth will be calculated, so long as its aim is to arrive at a figure that best reflects the "current status of the employer's operations *and prospects.*" *Id.* (emphasis added).

PBGC has determined the net worth of the employer here to be the positive net worth of Ropp Realty, *i.e.* $89,994. In so determining, PBGC, pursuant to an alleged practice,[6] treated as zero the negative net worth of West Side, which PBGC's financial analyst had determined to be $274,565.

Even bearing in mind our obligation to defer to the views of PBGC in its enforcement and interpretation of ERISA, *see, e.g., Connolly v. PBGC* (9th Cir.1978) 581 F.2d 729, 730, *cert. denied,* (1979) 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492, we conclude that the propriety of PBGC's decision to disregard West Side's negative net worth cannot be determined on this motion for summary judgment but presents a viable question of fact that must await a plenary hearing. At such hearing PBGC shall have the opportunity fully to present the reasons in support of its determination.

Authority on this question is sparse. PBGC misplaces reliance on *PBGC v. Ouimet Corp.* (1st Cir.1983) 711 F.2d 1085, *cert. denied,* (1983) 464 U.S. 961, 104 S.Ct. 393, 78 L.Ed.2d 337. There, the question before the court was not how a plan's sponsor's negative net worth should be treated for the purpose of determining whether employer liability exists, but how such liability, once assessed against a con-trolled group, should be allocated among its solvent and bankrupt members.

*PBGC v. Diamond Reo Trucks, Inc.* (W.D.Mich.1981) 509 F.Supp. 1191, although cited by neither side, is more apposite. There, PBGC sought to impose employer liability upon a controlled group, which included the plan's bankrupt sponsor. The controlled group members moved for summary judgment, challenging PBGC's decision to treat the bankrupt plan sponsor's negative net worth as zero. The court denied the motion, noting in its opinion that the plan sponsor's debts had been discharged by the bankruptcy court. *Id.* at 1194. Although the court did not so state directly, we surmise that this fact underlay its decision. In other words, because the debts had been discharged, they could have no bearing on the current status of the employer's operations and "prospects."

In contrast, West Side's debts were not discharged in bankruptcy. Arguably, then, its negative net worth *could* bear on the status and prospects of the employer. Accordingly, we cannot say as a matter of law that PBGC's net worth determination appropriately reflects such status and prospects.[7]

Finally, we tentatively reject PBGC's contention made at oral argument that, were it required to offset the positive net worth of controlled group members by the negative net worth of a plan's sponsor, controlled groups could avoid employer liability by so depleting the assets of the plan's sponsor that the aggregate net worth of the controlled group would be negative. In the first place, there is no suggestion that West Side's assets have been so depleted. Secondly, ERISA expressly authorizes PBGC to counteract any such depletion by increasing an employer's net worth by the value of the assets so depleted. *See* 29 U.S.C. § 1362(c)(2).

---

6. At oral argument, PBGC offered to submit any existing opinion letter that evidences this practice. Having received no such letter, we conclude that none exists.

7. We note that PBGC has made no representation that, in its determination, its method of calculation results in a net worth valuation that best reflects the status and prospects of the "employer," *i.e.* West Side and Ropp Realty.

In light of the foregoing, we deny PBGC's motion with respect to its claim for employer liability.

## CONCLUSION

PBGC's motion for summary judgment is granted with respect to its claim against West Side for due and unpaid employer contributions in the amount of $45,932 plus interest, but is denied with respect to its employer liability claim against West Side and Ropp Realty.

SO ORDERED.

## ON MOTION FOR REARGUMENT

The question presented by plaintiff's motion for reargument is whether we correctly found that a question of fact had been presented as to whether or not the plaintiff had, in determining the employer's net worth, followed the statutory mandate of considering its "operations *and prospects.*" Although we found originally that the language of the statute is unambiguous, which would preclude reference to legislative history, the plaintiff now contends that the problem has been resolved by a subsequent statute which clearly relieves it of any obligation to take such matters into account. Plaintiff argues that we should ignore the obligations of the concededly applicable statute and apply the wholly different new statute simply because a "Budget Committee" issued a report which suggests that Congress had no purpose in writing this rather drastic change except to confirm the procedures plaintiff claims to have followed under the old statute.[1] We do not accept this reasoning. It is well-settled that "it is the function of the courts and not the Legislature, much less a Committee of one House of the Legislature, to say what an enacted statute means." *Pierce v. Underwood* (1988) 487 U.S. 552, 566, 108 S.Ct. 2541, 2551, 101 L.Ed.2d 490; *see also PBGC v. LTV Corp.* (1990) — U.S. ——, ——, 110 S.Ct. 2668, 2678, 110 L.Ed.2d 579; *Bormann v. AT&T Commu-*

*nications, Inc.* (2d Cir.1989) 875 F.2d 399, 402, *cert. denied,* (1989) —— U.S. ——, 110 S.Ct. 292, 107 L.Ed.2d 272; *Madison Galleries, Ltd. v. United States* (Fed. Cir.1989) 870 F.2d 627, 633.

Plaintiff's motion for reargument is denied.

SO ORDERED.

---

1. As we observed at page 1254 of our original opinion, the plaintiff has not provided us with any evidence (except its bare assertion) that it has in fact uniformly applied this method.